**In re BEKER INDUSTRIES CORP., Debtor.**

**In re BEKER PHOSPHATE CORPORATION, Debtor.**

**Bankruptcy Nos. 85 B 11709, 85 B 11710.**

United States Bankruptcy Court, S.D. New York.

Dec. 20, 1985.

See also, Bkrtcy., 57 B.R. 611.

Rosenman, Colin, Freund, Lewis & Cohen by Paul L. Bindler, New York City, for Seidman Capital Corp. and Magten Asset Capital Corp.

Breed, Abbott & Morgan by C. MacNeil Mitchell, New York City, for Marine Midland Bank, N.A.

Bishop, Liberman & Cook by Robert Miller, David Strumwasser, New York City, for Jessup & Lamont Capital Corp.

Kronish, Lieb, Weiner & Hellman by William J. Rochelle, III, Sheri L. Josephs, New York City, for debtors-in-possession.

Weil, Gotshal & Manges by Ellen Werther, New York City, for National Bank of Canada, Commercial Credit Business Loans, Inc. and Commercial Credit International Banking Corp.

Wachtel, Lipton, Rosen & Katz by Chaim Fortgang, New York City, for Banks of Boston, N.A.

Strook & Strook & Lavan by Bonnie Schindel, Lawrence Handlesman, New York City, for Official Creditors Committee.

Harold Jones by Harold Jones, John Campo, New York City, for U.S. Trustee.

Donna Moore, New York City, for S.E.C.

## DECISION AND ORDER [*]

HOWARD C. BUSCHMAN, III, Bankruptcy Judge.

Seidman Capital Corporation and Magten Asset Management Corporation seek an order pursuant to 11 U.S.C. 151102(a) and (b) (1984) directing the United States Trustee to appoint a special committee composed of holders of 15⅞% Secured Subordinated Debentures (the "Debentures") issued by Beker Industries Corp. Marine Midland Bank, N.A., the Indenture Trustee, has joined in the motion. The United States Trustee supports the motion. Beker Industries Corp. and Beker Phosphate Corporation (the "Debtors") and the Bank of Boston, N.A., National Bank of Canada, Commercial Credit Business Loans, Inc. and Commercial Credit International Banking Corporation (the "Banks"), holders of secured debt on nearly all the assets of Beker Industries Inc., oppose the motion. Concurrently, Jessup & Lamont Capital Corporation seek an order appointing an equity holders committee for both holders of preferred and common stock. The motion is opposed by the Bank of Boston and is supported by the Securities Exchange Commission, the United States Trustee and the Debtors.

### FACTS

The Debtors filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 101 et seq. (1984) (the "Code"), on October 21, 1985. They have continued in possession. Beker Industries principally produces phosphate agricultural fertilizer. Beker Phosphate, a wholly owned subsidiary of Beker Industries, mines phosphate and sells it to Beker Industries. The statements of affairs list assets having an ascribed value of $321,000,000 for Beker Industries and $90,000,000 for Beker Phosphate. They assert liabilities of $228,000,000 for Beker Industries and $32,000,000 for Beker Phosphate.

Since the inception of these cases, they have been fraught with repeated activity which has reached only a momentary lull. Upon filing its petition, Beker Industries sought to use cash collateral held by three of the Banks. At a preliminary hearing held pursuant to § 363(c) of the Code, the motion was granted to permit use of $7,600,000. Shortly thereafter, Beker Industries commenced an adversary proceeding to avoid writs of sequestration obtained by Cargill Inc. ("Cargill") which tied up its entire inventory. At a hearing held on its motion for a preliminary injunction, a replacement lien was granted to Cargill by Beker Phosphate so that its parent and sole customer Beker Industries could operate and purchase ore from Beker Phosphate. At the continued hearing on Beker Industries' motion for use of cash collateral, it was ultimately permitted to enter into a modified financing agreement pursuant to § 364 of the Code with three of the Banks. By its terms, that agreement is only temporary and expires on December 31, 1985.

The community of interests involved in these cases is varied and widespread. Common and preferred stock issued by Beker Industries is traded on the New York Stock Exchange. Outstanding are roughly 12,000,000 shares of common held by 2,148 stockholders, at least as of March of this year, and 1,150,000 shares of preferred held by 339 entities. Debts listed by the Debtors in their lists of twenty largest creditors include significant sums owed to numerous public utilities and other entities. Included in the Beker Industries debt structure is $65,000,000 in principal amount of the Debentures. Those Debentures were issued in 1983. Repayment is secured by security interests in a chemical plant owned by Beker Industries and its interest in a mining partnership. On the date its petition was filed, Beker Industries claimed to own in excess of a 50% interest in the partnership. Apparently, an addi-

[*] Because of the need for immediate appointment of committees representing debenture and equity holders, the Court rendered an oral decision at the close of the hearing on November 26, 1985. Several attorneys requested the decision be published. What follows is that decision as edited slightly for publication with no change in substance.

tional partnership contribution was to be made shortly after the petition was filed in order to prevent readjustment and dilution of that interest. The contribution was not made. Beker Industries takes the position that its risk of a change ownership percentage was suspended by the triggering of the automatic stay provided by § 362(a) of the Code upon the filing of its Chapter 11 petition.

A hearing was held on November 8, 1985 with respect to the motion to appoint a special committee for the Debenture holders and on November 26 with respect to the motion for an equity committee. At the November 8 hearing, the Debtors opposed the motion to appoint a special committee for Debenture holders on three principal grounds: (i) that the motion and the making of it "may" be a violation of proxy rules promulgated under Section 14 of the Securities Exchange Act of 1934 and discovery should be allowed to determine such; (ii) that the movants hold approximately 42% in amount of the outstanding Debentures and thus it was averred that a committee was not needed to adequately represent this class of debt; and (iii) to appoint a committee would overly burden these beleaguered estates. At the hearing, this Court, relying on *Blue Chip Stamps v. Manor Drug Stores, Inc.*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1959) and *Decker v. Massey Ferguson, Ltd.*, 681 F.2d 111 (2d Cir.1982), denied the request for discovery as to possible proxy rules violations. It was observed that the mere pleading of a possible violation in order to obtain discovery was not sufficient, particularly where no facts were set forth. The hearing was then adjourned to permit exploration of the membership and composition of the class of Debenture holders and whether they were adequately represented.

At the subsequent hearing it was shown that the records of the Indenture Trustee reflect 54 holders of record of the Debentures. Forty-two of those holders hold Debentures in principal amounts ranging from $1,000 to $20,000; five hold $50,000 of principal amount; two hold principal amounts of $180,000 and $500,000 and four

hold principal amounts in excess of $1,000,-000. The bulk, $54,813,000, is held on deposit by Cede & Co., a depository institution for brokerage firms, for some eighty one institutions either for their own accounts or for customers. Of those institutions from whom information has been gained, four hold $22,020,000 in principal amount of Debentures for 430 separate accounts. In addition, Magten Asset Management Corporation, one of the movants, holds Debentures of approximately $7,500,000, in principal amount, for 21 customers as a registered investment advisor and manager to various pension funds and individuals. Furthermore, Bear, Stearns & Co. ("Bear Stearns") reports that 42 of its accounts hold Debentures. The records of Depository Trust reflect that Bear Stearns has $4,876,000 in Debentures on deposit.

With respect to the common stock, management and insiders hold roughly 27%. According to a proxy statement dated March 30, 1985, another 10% was held by two entities; at the November 26 hearing it was stated that one entity had sold its shares, probably in the public market.

## DISCUSSION

Section 151102(b) of the Code provides that, in addition to an official unsecured creditors committee, "the court may order the appointment of additional committees of creditors or of equity security holders if necessary to assure adequate representation of creditors or of equity security holders."

■ The statute affords no test of adequate representation, leaving the bankruptcy courts with discretion to examine the facts of each case to determine if additional committees are warranted. Certain benchmarks have thus been developed. Collier notes:

> ... in a large case, in which there are significant groups of creditors or equity security holders with conflicting claims which are likely to be affected by the plan of reorganization, the court should authorize the appointment of additional

committees. Such committees should be composed of creditors or equity security holders representative of classes as a whole as opposed to dissident factions of particular classes.

*See* 5 L. King, *Collier on Bankruptcy* ¶ 1102.2 at 1102–18 (15th Ed.1984); *accord In re Fidelity America Mortgage Co.*, 7 B.C.D. 1186 (Bankr.E.D.Pa.1981). The exercise of discretion, however, also gives rise to a concern for cost, since the appointment of additional committees is "closely followed by applications to retain attorneys and accountants." *In re Saxon Industries Inc.*, 39 B.R. 945, 947 (Bankr.S.D.N.Y. 1984), *see also Matter of Baldwin-United Corp.*, 45 B.R. 375, 376 (Bankr.S.D.Ohio 1983). The statutory focus is on adequacy of representation. In a sense this is implicit in the statement from Collier's to the effect that a wide-spread holding shows the need for adequacy of representation. It thus appears that once the statutory tests are met, the burden shifts to the opponent of the motion to show that the cost of the additional committee sought significantly outweighs the concern for adequate representation and cannot be alleviated in other ways.

■ Here it is clear that the holders of Debentures and stock need to be represented by separate official committees. Most importantly, the public debt here is widely held. While a significant portion, particularly of the public debt, may be held for their own account by institutions having the financial interest and means to represent themselves, the presence of at least 400 holders of small amounts indicates the need for their representation through an official committee having the fiduciary responsibility of acting on their behalf. The same is true of the shareholders. The position that some members of the class may have resources sufficient to protect their interests is of little significance, in our judgment, at least where the security is widely held. They do not have the fiduciary duty to represent their fellow security holders.

With respect, moreover, to the Debenture holders, it would appear that the debt they hold is partially or wholly secured. If wholly secured, the Debenture holders are thus ineligible for membership on the unsecured creditors committee. Indeed, the unsecured creditors have refused to admit them to membership on the unsecured creditors committee. If only partially secured due, *inter alia*, to Becker Industries' failure to make an additional contribution to the partnership, the debt is subordinated. The holders of unsecured public debt that needs to be reorganized were traditionally recognized as requiring protection of a trustee under the former Bankruptcy Act and therefore supporting transfer from former Chapter XI to former Chapter X. *See Securities & Exchange Commission v. American Trailer Rentals Co.*, 379 U.S. 594, 613–14, 85 S.Ct. 573, 523–24, 13 L.Ed.2d 510 (1965); *In re Arlan's Department Stores, Inc.*, 373 F.Supp. 520 (S.D.N.Y.1974). Here there is a question as to whether the Debenture holders are fully secured.

■ In addition, the complex nature of this large case requires representation of Debenture holders and shareholders. As Collier illustrates, the size of a bankruptcy case strongly indicates the need for additional committees representing different interests. 5 L. King, *supra.* A large case brings with it not only a varied debt structure but a complex business requiring significant post-petition financing and a heavily negotiated plan. Here post-petition financing is due to expire in five weeks and the ability to reorganize will likely depend upon the acceptability to the creditor body of available replacement financing.

In short, this is not a case where the Debenture holders and shareholders will be asked merely to vote on a plan. This is a case requiring active participation by Debenture holders and shareholders to protect their interests.

To all this, the Debtors respond that representation of the Debenture holders is not required because of the presence of an Indenture Trustee, and because it may be

that some of the Debentures held for individuals are lodged in discretionary or managed accounts. They add that, in their view, the making of the motion violates the Indenture.

■ These arguments are of no merit. If the mere presence of an indenture trustee were thought to bar appointment of a committee for debenture holders pursuant to § 151102(b) and § 1102(a)(2) of the Code, those sections would have excluded debenture holders from their embrasive coverage for nearly all debenture issues have provided for an indenture trustee. Moreover, contrary to the position of the Debtors and that of the Bank of Boston, the rights provided to ˄ the Indenture Trustee here upon default or Beker Industries entering bankruptcy, as set forth in ¶¶ 6.02–6.05 of the Indenture—the pursuit of legal remedies, taking possession of the collateral and its proceeds, and appointment of and seeking the appointment of a receiver—are all effectively barred by the automatic stay provided by § 362(a) of the Code. Furthermore, the rights and duties of committees are far broader than that afforded the Indenture Trustee in this Indenture. Also ¶ 7.01(b) of the Indenture would on its face limit the fiduciary responsibility of the Indenture Trustee. It states:

(1) The Trustee need perform only those duties that are specifically set forth in this indenture and no others;

(2) In the absence of bad faith on its part the Trustee may conclusively rely as to the truth of the statements and the correctness of the opinion expressed therein upon certificate or opinions furnished to the Trustee and conforming to the requirements of this indenture. However, the Trustee shall examine the certificates and opinions to determine whether or not they conform to the requirements of this indenture.

The rights and duties of a committee, and its investigation and consequent reliance as set forth in § 1102 of the Code are far broader.

■ Secondly, the assertion that the making of the motion violates § 6.09 of the Indenture is not worthy of discussion. The section only limits the ability of a Debenture holder "to purse a remedy with respect to this Indenture or the Securities ..." Seeking the appointment of a committee falls into neither category.

■ Third, that some of the Debentures might be held in discretionary accounts is also irrelevant. Discretion gives a securities broker the power to trade in securities and to act as attorney in fact with respect to such trades. Charles H. Meyer, *The Law of Stockbrokers and Stock Exchanges*, § 62 (1931). Those powers are irrelevant to the pursuit of rights under the Bankruptcy Code. At the previous hearing, the Debtors conceded as much as to the motion to appoint an equity committee. Although they observed that many of the holders of equity in this case might also hold securities in discretionary accounts, they consented to the motion. Moreover, the opponents' reliance on *In Re Emons Industries Inc.*, 50 B.R. 692 (Bankr.S.D.N.Y.1985), *Matter of Baldwin-United Corp.*, 43 B.R. at 375 and *Saxon*, 39 B.R. at 945, is without merit. In each of those cases, committees were appointed. The court in *Baldwin-United* denied appointment only for each class of equity, noting that the debtor had anywhere from twenty to fifty classes of equity. In *Emons* an equity committee was appointed, this court stating that generally there should not be an equity committee where a debtor is hopelessly insolvent and not every case requires one. In *Saxon* a debenture holders committee was appointed. The court denied a motion to reconstitute on the ground, *inter alia*, that to grant the motion would exclude some debenture holders who needed representation.

■ Here the Debtors are solvent or, at least, claim to be, and the widespread holders of stock and Debentures need representation. Indeed, the Debtors need to have them represented. The purpose of Chapter 11 is to negotiate and confirm a plan. Debenture holders and stockholders have significant interests in these cases and negoti-

ation with representatives of all of them will be required.

Nevertheless, the very complexity supporting appointment of a committee also gives concern for the fees and expenses it will incur. The powers of a committee, set forth in § 1102(c) of the Code, are broad. Applications to employ counsel are inevitable. The opponents to these motions, however, have not shown that the cost is so burdensome to deny official representation.

But the cost of the official unsecured creditors, equity and debenture committees does cry out for some prospective management. These committees can and should determine their joint interests and address them jointly; steps to minimize duplication can and should be taken; fees and expenses are to be closely monitored by committee members so that this Court is not presented with matters that have run out of hand and is faced with a plethora of objections. Applications to employ professionals in addition to attorneys are to be deferred until after January 1, 1986, when the Debtor's financing will be clarified. Finally, because of the Debtor's current cash flow problems, no interim fee applications are to be made until March 31, 1986. At that time it will be considered whether further deferral is proper or warranted.

That deferral, however, does not preclude motions being made to conserve expenses upon monitoring fees. Fees should not be built up beyond reasonable expectations. All parties in interests should be concerned about expenses in these cases. They are to work out a process whereby statements of the fees being incurred on a monthly or perhaps an even shorter period of time can be circulated among the committees, the Banks, the Debtors, and the United States Trustee, so that a handle can be kept on these fees and they do not escalate unreasonably.

In summary, it is the shaky nature of these cases that leads primarily to the judgment that these wide-spread holders of stock and Debentures need representation here. This is not a case of a debtor who has filed for bankruptcy because of a temporary cash flow problem that former Chapter XI was designed originally to give him time to cure and to come to an arrangement with his creditors. As was perfectly evident from the cash collateral hearings, these are debtors who have significantly more problems.

The United States Trustee is, therefore, ordered to appoint representative committees representing equity holders and Debenture holders. He is further directed, in forming a representative committee, to solicit the holders of smaller holdings to serve on those committees. They are the people who are most in need of representation in these cases.

IT IS SO ORDERED.