**In re BEKER INDUSTRIES CORP. and Beker Phosphate Corporation, Debtors.**

**Bankruptcy No. 85 B 11709–10.**

United States Bankruptcy Court, S.D. New York.

Aug. 5, 1986.

See also, Bkrtcy., 63 B.R. 474.

Kronish, Lieb, Weiner & Hellman by William J. Rochelle, III, New York City, for debtors.

Dewey, Ballentine, Bushby, Palmer and Wood by Martin Domb, New York City, for Western Co-operative Fertilizers (U.S.) Inc.

Kramer, Levin, Nessen, Kamin & Frankel by Burton S. Weston, New York City, Special Counsel for Western Co-operative Fertilizers (U.S.) Inc.

Rosenman Colin Freund Lewis & Cohen by Paul L. Bindler, New York City, for the Official Debenture Holders' Committee.

Stroock & Stroock & Lavan by Bonnie Schindel, New York City, for the Official Unsecured Creditors' Committee.

Bishop, Liberman & Cook by David Strumwasser, New York City, for the Official Equity Holders' Committee.

## DECISION

HOWARD C. BUSCHMAN III, Bankruptcy Judge.

Western Co-operative Fertilizers (U.S.) Inc. ("WCFL"), individually and on behalf of a partnership, seeks an order from this Court pursuant to § 365 of the Bankruptcy Code, 11 U.S.C. § 365 (1984) (the "Code"), requiring its partner, Beker Industries Corp. ("Beker" or the "Debtor"), to determine forthwith whether to assume or reject certain executory contracts relating to the Conda Partnership. It further seeks authorization to terminate an operating agreement between Beker and the Conda Partnership, and authorization to adjust the equity interest in the Conda Partnership between the two partners to reflect a $1 million capital contribution by WCFL. The Debtor and the Official Debenture Holders' Committee oppose the motion. A hearing was held on July 17, 1986.[1] As announced at the hearing, the Court, because of the urgency of the matter, is addressing only the first branch of this

motion. A subsequent decision will address the remaining two branches.

### I.

Beker manufactures and sells phosphate fertilizer products. It and a subsidiary filed petitions on October 21, 1985, seeking reorganization under Chapter 11 of the Code. Among Beker's principal assets are a phosphate fertilizer plant in Conda, Idaho, and an interest in an Idaho general partnership ("the Conda Partnership"), whose sole purpose is to mine phosphate ore and convert it into phosphate rock for sale to its partners. This plant and partnership interest (the "Conda Assets") secure the roughly $72 million of principal and interest due with respect to the 20 year, $15\frac{7}{8}\%$ secured subordinated debentures issued by Beker in 1983.

WCFL and Beker are the sole general partners in the Conda Partnership. The Conda Partnership was formed pursuant to an agreement between Beker and WCFL dated as of December 20, 1978, and amended on January 8, 1981 and August 1, 1985 (the "Partnership Agreement") (Exhibit 1).

The Conda Partnership owns and leases several tracts of land containing phosphate deposits in Caribou and Bear Lake Counties, Idaho, and a rock beneficiation and processing facility in Conda, Idaho. After mining the phosphate ore and processing it into phosphate rock, it sells this product to its two partners, pursuant to separate but essentially identical supply contracts between the Conda Partnership and each of its partners (the "Supply Contracts") entered into on the same dates as the Partnership Agreement (Exhibit 2, the "Beker Supply Contract" and Exhibit 3, the "WCFL Supply Contract"). Each partner uses the phosphate rock in the production of fertilizer, the Debtor at its Conda fertilizer plant adjacent to the Conda Partner-

1. At the hearing, the Debtor and the Debenture Holders' Committee requested adjournment to July 23, 1986, the date on which a hearing was scheduled with respect to the sale contemplated by the Debtor. That request was denied on the grounds that WCFL had brought in its witness from Calgary, Canada and that to adjourn the motion further would leave this Court in a position where it would be forced to rule immediately if the relief requested were to be granted.

ship facilities, and WCFL at its Canadian parent company's plant located in Calgary, Canada.

The Debtor provides certain services to the Conda Partnership pursuant to an agreement dated December 20, 1978 (the "Operating Agreement") (Exhibit 4). As Operator, the Debtor is to be responsible for the maintenance of accounting and other records, the payment of royalties on the Conda Partnership's leases, replenishment of spare parts and arrangements for the supply of utilities and other services to the Conda Partnership. The Conda Partnership is to compensate the Debtor for these services.

The Conda Partnership's mining and processing activities are funded entirely by payments received from its two partners to whom it sells phosphate rock essentially at cost as provided in the Supply Contracts. Each partner is required to make payments on account based on weekly invoices issued to each partner by the Conda Partnership (Tr. at 33).[2] The price of the phosphate rock which is actually delivered is determined under the Supply Contracts, and represents approximately the average cost that the Conda Partnership incurs to produce the tonnage delivered to each partner per year.

The amount chargeable to each partner under the Supply Contracts is determined on the basis of variable and fixed components. The variable component consists of the mining costs incurred by the Conda Partnership, calculated on a per ton basis with each partner paying the same amount per ton (Tr. at 37). Total variable costs thus depend on the amount of rock taken (Tr. at 34–37). Fixed components are approximately one-third of the total cost of producing rock, and generally are divided evenly between the two partners. Where mining has ceased during any particular year and consequently less than 1.9 million tons of beneficiated phosphate rock is produced by the Conda Partnership annually, each partner is obligated to pay, *inter alia,* its percentage share of variable cost on the basis of deliveries to it, a capital cost pegged at $12.50 per ton, and one-half of the Conda Partnership fixed costs. Fixed costs include insurance for the mine and beneficiation plant, fuel costs, electricity, payments to outside contractors, maintenance and turnaround costs, taxes, minimum royalties on the mineral leases, equipment rental and salaries for the staff employed there (Tr. at 34, 39; Exhibit 2). Fixed costs do not include any penalty incurred under the agreement with the Conda Partnership's mining contractor. If such a penalty is imposed, the partners are to negotiate its allocation (Exhibit 2).

As originally structured, WCFL and the Debtor each own a fifty percent interest in the Conda Partnership. Pursuant to paragraph 9 of the Supply Contracts, the Conda Partnership generally is to operate on a monthly basis with invoices for the prior month submitted to each partner by the fifteenth day of the subsequent month. The sum charged for fixed costs does not include the $12.50 per ton capital cost. Adjustments, including capital costs, are to be made annually. The monthly invoices are due in ten days. If the Conda Partnership determines that it lacks sufficient cash to make payment of an obligation when due, the Supply Contracts call for it to invoice each partner not more than five days before and to be paid in two days. If delivery of product to one partner for the prior month exceeds deliveries to the other, that partner is invoiced 55% of the obligation and the other partner is invoiced 45%.

It is undisputed that, prior to the filing date, the Debtor had defaulted on its obligations under the Beker Supply Contract, in the approximate amount of $5,694,785.00 (Tr. at 81). WCFL claims that the Debtor's default has greatly impaired the Conda Partnership's ability to pay its own creditors. On the filing date, these obligations amounted to over $9 million to third parties (Tr. at 44) and over $2 million to WCFL. WCFL asserts that it has paid all of its Conda Partnership invoices punctually.

**2.** References are to the transcript ("Tr.") dated July 17, 1986, unless otherwise noted.

Also prior to the filing date, WCFL, acting under the Partnership Agreement, attempted to alter the partners' equity interest in the Conda Partnership. The Partnership Agreement provides that, if one partner fails to pay partnership invoices when due, the other partner may pay such amount and elect to treat this advance as a capital contribution to the Conda Partnership requiring an adjustment of the partner's equity interest, unless the defaulting partner repays that amount plus interest within 45 days (Exhibit 1 at ¶ 7.3). When WCFL made an advance on the Debtor's behalf on September 19, 1985 in the amount of $1 million, to cover partnership invoices that the Debtor failed to pay, WCFL elected to treat this amount as a capital contribution to the Partnership, with the equity interests adjusted accordingly, if it were not repaid in 45 days (Exhibits 16 and 17).

The Debtor does not dispute that it has not repaid this advance. It, however, does claim that filing of the petitions before the 45 day period expired, prevented WCFL or the Conda Partnership from effectuating the change of equity interests.

The day after Beker filed its petition, WCFL and Beker reached an agreement whereby the Conda Partnership would resume deliveries to the Debtor if Beker would pay in advance for such deliveries at a calculated unit price (Tr. at 44–45). The Debtor began doing so on October 30, 1985, at a price and in an amount which was, WCFL claims, "consistently" less than the amount the Debtor originally indicated it would take, to WCFL's detriment (Tr. at 45). This practice continued through January 1986, and at the end of that month, WCFL filed its motion in this Court for an order requiring the Debtor to determine by a specified date whether to assume or reject the Partnership Agreement and the Beker Supply Contract.

Before the return date of WCFL's motion, WCFL and Beker entered into an "Interim Settlement Agreement" dated February 21, 1986 (Exhibit 11). They agreed that WCFL would adjourn its motion and permit delivery of rock to Beker until mid-May 1986, at an established unit price, provided that Beker maintained minimum levels of purchases from the Conda Partnership. Because Beker then lacked long-term financing and, therefore, had a restricted cash flow, the partners agreed to a price for the Debtor which was below the Conda Partnership's estimated cost of production, with the difference ($3.50 per ton) constituting an administrative priority claim of the Conda Partnership against the estate. The Interim Settlement Agreement also called upon the parties to use their best efforts to agree, by April 2, 1986, on a mining plan for the Conda Partnership for 1986.

The Debtor's financing agreement with its banks and a fourth lender was approved by this Court on March 4, 1986, *see* 58 B.R. 725, 13 B.C.D. 136 (Bankr.S.D.N.Y.1986) and granted to its banks, pursuant to 11 U.S.C. § 364(d), a $10 million first lien on the Conda Assets senior to that of the debentureholders.

Subsequent negotiations between the partners resulted in two agreements. The Conda Partnership, Beker and WCFL entered into an agreement dated April 2, 1986 (Exhibit 12), setting forth the terms under which the Conda Partnership would mine and the funding therefor, which was to become effective only upon the approval of this Court. On April 3, 1986, the Conda Partnership and Washington Corporation, the mining contractor, entered into a mining agreement (Exhibit 15). After a hearing on May 5, 1986, at which no objection was raised, this Court entered an order authorizing the Debtor to enter into the April 2 Agreement, thereby making it and the April 3 Agreement effective.

Briefly, the April 2 Agreement provided for payment by Beker to the Conda Partnership of $200,000 to be held in escrow to be used to satisfy Beker's obligations under that agreement and additional obligations incurred by the Conda Partnership, including any mining penalty and increase in mining costs. Payments by Beker for phosphate rock delivered to it were adjust-

ed, but generally, all other costs were to be paid as provided in the Beker Supply Contract and Partnership Agreement.

Immediately after Court approval on May 5, 1986, the Conda Partnership began making deliveries to Beker. On May 19, 1986, however, Beker announced that operations at its Conda facility would be suspended, and attempts to sell that facility as well as its interest in the Conda Partnership would be made immediately (Tr. at 46). Beker stopped taking delivery of rock from the Conda Partnership and ceased operations at Conda on approximately May 26, 1986 (*Ibid.*). There is no evidence indicating whether Beker made the escrow payment called for by the April 2 Agreement. It is undisputed that Beker paid $7 million for rock delivered after Beker filed its petition until deliveries were stopped and owes $2 million for such rock (Tr. at 48).

In view of Beker's termination of operations at Conda, the Official Equity Holders' Committee, on May 30, 1986, moved under Rule 60(b) of the Federal Rules of Civil Procedure ("FRCP") for an order relieving it of the Court's order of May 5, 1986 approving the Conda Agreement. The Debtor joined the motion, WCFL opposed it. On the return date of the Rule 60(b) motion, June 5, 1986, counsel for WCFL stated that he intended to move again for assumption or rejection of agreements relating to the Conda Partnership (Tr. 6/5/86 at 23). WCFL also stated its position that "August or early August" was "the real economic deadline for coming to a determination" on decisions with respect to Conda (*Ibid.*). The Debtor and Equity Holders' Committee agreed that Beker had to make those decisions including whether to sell its Conda Assets by the beginning of August (Tr. 6/5/86 at 18–21). The Debenture Holders' Committee and the Unsecured Creditors' Committee took the position that the schedule should be set by economics, not established deadlines (Tr. 6/5/86 at 22–23, 20–21). On consent of all the parties, that motion was adjourned to August 12, 1986 by which time it was expected that the matter would be clarified.

On June 10, 1986, WCFL, on behalf of the Conda Partnership, suspended all mining activity (Exhibit 27), and brought the instant motion.

Before the instant motion came on to be heard, the Debtor, on July 14, 1986, sought authorization from this Court to sell at auction all its rights, title, and interest in the Conda plant and the Conda Partnership at a minimum upset price of $21 million or to abandon same. A hearing to consider objections to such an auction was set for July 23, 1986, and the auction sale, subject to the Court's determination on July 23, was set for August 1, 1986. The hearing and sale were adjourned at the request of the Official Committee of Debenture Holders who claim, *inter alia*, that the Conda Assets were not properly marketed.

In this chaotic status, the costs of the Conda Partnership have continued to mount. From having ceased mining operations, the Conda Partnership faces a mining penalty claim from its contractor. In addition, on July 15, 1986, came due an annual payment of $700,000 due to the Royal Bank of Canada pursuant to a promissory note given in connection with the Conda Partnership's purchase of certain mineral reserves. The note is collateralized by a mortgage, presumably on the reserves. To avoid default, WCFL made the full payment including Beker's 50% share.

In addition to this extraordinary item, the Conda Partnership's ordinary fixed costs are being borne by WCFL. The testimony of its president, David B. Smith, that the Conda Partnership's fixed costs in a mothballed condition are approximately $1 million a year (Tr. at 38), is unchallenged. Also undisputed is his testimony that, if the Conda Partnership facilities were not mothballed and were kept in a position to start up quickly, fixed costs would escalate to a figure between $5–10 million a year (Tr. at 40). Moreover, the Conda Partnership is currently engaged in arbitration with its mining contractor (Tr. at 68), concerning amounts charged to the Conda Partnership in the past. WCFL has absorbed all the

costs attendant to this arbitration, including legal fees and time of Conda Partnership management.[3] As Smith so precisely put the issue before us:

> If [the agreements are] assumed ultimately it means someone has to keep the whole thing alive in the meantime. Who is going to pay all the bills?

(Tr. at 84).[4]

But that harm is not all the harm faced by WCFL. It is faced with the uncertainty implicit from not knowing if it will continue to have a partner at all and a partner who will take significant deliveries so as to keep the costs of delivered rock to an amount bearing some reasonable relation to the market prices for the fertilizer that is manufactured from that supply (Tr. 67, 102). It is at least hesitant to make partnership decisions such as resolution of disputes with the mining contractor (Tr. 70).

Most significantly, WCFL faces a particularly acute dilemma arising from its need to supply the fertilizer plant of its parent. That plant is the sole source of fertilizer for three major Canadian grain pools, and has a market share of roughly 25% of the Western Canadian market (Tr. at 13). To cover in amount sufficient to satisfy its needs, it will have to purchase several hundred thousand tons of rock (Tr. at 54). Spot purchases will not be of assistance since the per ton cost will be highly excessive (Tr. at 53). Covering, by itself, is not particularly harmful to WCFL's parent. If it does cover in large amounts, the cost to it will be less than the cost of production at Conda plus delivery costs (Tr. at 87–88).

Instead, the dilemma arises from the need to arrange such purchases in the near future so that delivery can commence in September 1986. During that period WCFL's parent fertilizer plant is shut down for its annual turnaround mainte-nance work (Tr. at 58–59). On reopening, it will require sufficient quantities to recommence production and delivery thereafter to carry it through the winter (Tr. at 101), since the cost of winter mining at Conda is prohibitive (Tr. at 100). Arranging for cover entails, moreover, negotiations with its competition who control major terminals and lining up transport through those terminals (Tr. at 96). Thus, WCFL would not be able to bear the cost to mine at the reduced rate to satisfy its own needs, since there is no correlative reduction in the cost of mining that reduced amount (Tr. at 67, 102) and it would run out of rock (Tr. at 51–52).

Yet if the Supply Contract and Partnership Agreement are assumed after those commitments are made and the entity to whom Beker assigns those contracts pursuant to § 365(f) of the Code desires to commence mining in the late summer or fall, WCFL will incur significant increased fixed costs of $5–10 million annually from recommencing operations. As Smith testified,

> That to us is a very wrong procedure. We think either you should have to assume—somebody should have to assume or the thing should have to be rejected and then we don't face in the—even though we would have to carry on costs to perserve our investment in the future then we don't face somebody coming along and saying, okay, even though [WCFL] made an arrangement elsewhere [WCFL must] pick up half the fixed costs. In other words, we carry it on for some indeterminate period and somebody else gets the benefits of the Agreement.

(Tr. at 90–91).

> But, unless we knew it was going to happen for certain then I am left on August 1st and I don't know whether we are going to get any decision in time to

---

3. In addition to incurring fixed costs, the Conda Partnership will be accruing additional costs. These principally consist of settlement of a $6 million claim by Washington from a prior mining penalty and monthly accrual of the $700,000 due to Royal Bank of Canada on July 15, 1987.

4. The Debenture Holders' Committee, which opposes the sale taking place on August 1, 1986, initially recognized that the costs incurred by the Debtor in keeping the Conda plant operating are administrative expenses chargeable to the estate under § 506 of the Code (Tr. 7/14/86 at 17–18), but subsequently retracted their agreement to that proposition (Tr. 7/21/86 at 4).

get rock that we can afford from this operation. Therefore, I have to go in an alternative direction.

(Tr. at 95).

## II.

The only true opposition to the motion comes from the Debenture Holders' Committee appointed by this Court, see 55 B.R. 945, 13 B.C.D. 1230 (Bankr.S.D.N.Y.1985) to represent the holders of Beker's debentures (the "Committee"). While the Debtor purports to oppose the motion, its position is that it plans to sell its Conda Assets at the sale originally scheduled for August 1, 1986 at which time or soon thereafter the purchaser will indicate whether either or both of the two agreements should be assumed or rejected. It also takes the position that WCFL suffers from no uncertainty as to its future, for WCFL will be a large factor in determining whether or not a purchase will be likely, citing WCFL's role in negotiating with potential purchasers before a sale takes place. Depending on how these negotiations proceed, Beker asserts, WCFL will know whether a sale will transpire and it will soon have a partner, or whether a sale is not likely and it will have to make alternative arrangements for rock. These arguments are easily dismissed. They ignore the evidence, adduced on the motion, of the fixed costs of maintaining partnership assets and the large sums already advanced by WCFL and the dilemma it faces.

More is at stake for the debentureholders. They have a lien on the Conda Assets and are thus highly interested in the preservation of those assets so that they can be sold for a maximum price. On this motion, they do not claim that those assets will equal or exceed their lien. That interest became more acute when this Court, in orders dated March 4 and 5, 1986, granted Beker's motion for approval of a financing agreement whereby the debentureholders' lien on the Conda Assets was primed by a first lien granted to certain lenders, see 58 B.R. 725. They thus assert the possibility that a "hasty" rejection will chill the interests of a potential purchaser, and harm the debentureholders through lowering the value of price that might be received from sale of the Conda Assets. As to the harm to WCFL, the Committee asserts that WCFL is protected without a decision by Beker by virtue of Beker's inability to meet its obligations under the Beker Supply Contract, by Beker's seeking a purchaser for its Conda plant and interest in the Conda Partnership and that claims for costs incurred post-petition will be entitled to a first priority.

Consistent with their concern for a "hasty decision," the Committee has opposed the Debtor's notion to sell the Conda Assets on August 1, 1986. After receiving briefs on the issue of whether a debtor can sell these assets under § 363(f) of the Code and after hearing the Committee's complaints regarding its failure to obtain discovery and regarding its need to develop expert testimony, the Court adjourned the sale without date pending a ruling on that issue. It was subsequently determined that an evidentiary hearing was necessary. That hearing is to be held on August 11, 1986.

## III.

Section 365(d)(2) of the Code provides that a Chapter 11 debtor-in-possession may assume or reject an executory contract, other than an unexpired lease of non-residential real property at any time prior to confirmation but that the court may order it to make that election within a specific period of time. No standards by which that determination is to be made are expressly provided.

It is, nevertheless, established that, in applying its discretion,

the court must take into account the nature of the interests at stake, the balance of hurt to the litigants, the good to be achieved, the safeguards afforded those litigants, and whether the action to be taken is so in derogation of Congress' scheme that the court may be said to be arbitrary.

*Matter of Midtown Skating Corp.*, 3 B.R. 194, 198 (Bankr.S.D.N.Y.1980). In the application of these factors, it is beyond cavil that

> § 365(d) allows the trustee or debtor-in-possession a reasonable time within which to determine whether adoption or rejection of the executory contract would be beneficial to an effective reorganization.

*Matter of Whitcomb & Keller Mortgage Co., Inc.*, 715 F.2d 375, 379 (7th Cir.1983); *accord Theatre Holding Corp. v. Mauro (In re Theatre Holding Corp.)*, 681 F.2d 102, 106 (2d Cir.1982). But, as to this primary factor, Beker makes no contention that it has not had a reasonable time to make that determination with respect to these contracts which it concedes are executory. As noted, it desires to sell on August 1, 1986, or abandon the Conda Assets, determining in accord with the wishes of the potential purchaser, if the property is sold, whether the contracts are to be assumed or rejected.

Similarly, the Committee makes no claim in its opposition papers on this motion that Beker has not had a reasonable time. It speculates that "[I]t is possible that the Conda assets will fetch a higher price if the Conda Partnership Agreement and Supply Contract are left intact." (Committee's Memorandum at 7). It claims that a perception by a purchaser that it will not obtain the benefits of the Partnership Agreement if the ability to assume is lost "may influence negatively that purchaser's decision...." (*Ibid.*) And in opposing the Debtor's decision to sell the property on August 1, 1986, it seeks a period of time to market the Conda Assets.

That desire puts in sharp focus the most pressing concerns relevant to this motion: the interests at stake and the balance of hurt. As to the Debtor, these considerations are minimal. Indeed, it appears that this estate is being harmed by delay. Administrative claims are accruing at a rapid rate from the Debtor's failure to pay postpetition partnership costs, including its 50% share of the $700,000 paid by the partnership to Royal Bank of Canada on July 15, 1986, and failure to pay $2 million in postpetition rock costs. Continuing partnership costs, even were Beker not to take any rock, at a rate of $1 million/year if the Conda Partnership facilities are mothballed, not including a mining penalty owed to the mining contractor, and substantially increased costs if the facilities are not mothballed will increase those first priority claims. Accordingly, the Debtor offers no true opposition to the motion. Its responsive papers reflect a business judgment to end further expense through making the decision to assume or reject in conjunction with a sale on August 1 at an agreed price of $21 million, far below the $82 million of secured debt that the Conda Assets secure.

To the Committee, the interest at stake lies in maximization of the selling price of the asset and the need of a prospective purchaser to determine to assume or reject these agreements. As to the Partnership Agreement, the notion has some support in Smith's statement that to start mining, WCFL may require an escrow to cover mining costs (Tr. at 74) similar to that in the April 2 Agreement. Presumably it could insist on such a requirement were the Partnership Agreement to be rejected and the Debtor unable to assume and cure its failure to match the $1 million contribution made by WCFL in October 1985. More support lies on this record for the contention that termination of the Supply Agreement may substantially impact price. Smith testified that the principal protection for Beker or a purchaser of its interests lies in the ability to obtain rock at partnership cost.

To WCFL, the stake involved and hurt are four fold: (i) non-payment of its prepetition debt of $5 million, (ii) its continued shouldering of partnership costs since May 1986, (iii) the uncertainty of its partnership and (iv) the prospect of incurring additional partnership costs in addition to mothball costs should Beker or a buyer decide to mine rock after it or its parent has obtained cover.

As to the first of these, WCFL relies on *In re McLouth Steel Corp.*, 20 B.R. 688 (Bankr.E.D.Mich.1982) where the court, in granting a motion under § 365(d), ordered the debtor to assume or reject a services agreement within 29 days, notwithstanding it having fulfilled its post-petition obligations, because its failure to cure a pre-petition $1.5 million debt amounted to an "interest free loan." *McLouth Steel*, 20 B.R. at 692. Standing by itself, however, the failure to cure a pre-petition default is not sufficient ground under § 365(d); the status of the holder of a pre-petition claim is not changed by the provision of post-petition services. *Matter of Whitcomb & Keller Mortgage Co., Inc.*, 715 F.2d at 379; *In re Wheeling-Pittsburg Steel Corp.*, 54 B.R. 385, 388 (Bankr.W.D. Pa.1985).

Of more seriousness is Beker's having failed to pay its post-petition obligations. WCFL observes that several cases, in denying § 365(d) motions, have stressed a debtor's keeping current with post-petition obligations and reasoned that the resultant absence of harm to an obligee to an executory contract belies a need to require a debtor to assume or reject prior to confirmation. *E.g., Wheeling-Pittsburg Steel*, 54 B.R. at 388. The converse of this proposition, however, is not necessarily true. Congress made no such provision. In amending § 365(d) in 1984, Congress added § 365(d)(3). That section requires a debtor-in-possession to "timely perform" all of the post-petition obligations of the debtor only under leases of nonresidential real property. The failure to make such payments is an element to be considered in determining whether cause exists pursuant to § 365(d)(4) to extend the 60–day period for assumption or rejection. Not even in this area where Congress has acted has it provided for mandatory assumption or rejection on the ground that a debtor failed to keep current. In *Theatre Holding*, moreover, the Second Circuit stated that a debtor's failure to satisfy post-petition obli-

gations is but one element of consideration in setting a reasonable time for a debtor to assume a lease constituting its principal asset in the initial period after it filed its petition.[5] 681 F.2d at 106.

But, as *Theatre Holding* also indicates, the court in drawing a balance is to give greater weight to a debtor's failure to perform post-petition obligations over a longer period of time in which it could decide what to do with the asset. 681 F.2d at 106. The obligee is not expected to incur significant added detriment while those who have an interest in the property or the bankruptcy estate are unable to resolve how to deal with an asset.

Particularly is that so when the delay adds uncertainty and threatens the obligee with additional post-petition costs. Congress in enacting § 365(d)(2) attempted to receive that uncertainty, stating, "[t]his provision will prevent parties in contractual or lease relationships with the debtor from being left in doubt concerning their status vis-a-vis the estate." H.Rep. No. 95–595, 95th Cong., 1st Sess. 348–9 (1977), U.S. Code Cong. & Admin.News 1978, pp. 5787, 6304, 6305. Such doubt from the risk of rejection, when it concerns an entire enterprise and the jeopardizing of a major investment, can be paralyzing, and far outweigh the benefit to be derived by creditors. *See In re Petur U.S.A. Instrument Co., Inc.*, 35 B.R. 561, 9 C.B.C.2d 1363 (Bankr.W.D.Wash.1983).

That concern takes on increased weight when it is the obligee's future cash flow which is to utilized to fund the opportunity for realization of benefit to creditors and equity holders. To be sure, if a debtor assumes the contract, the default must be cured or adequate assurance of its prompt cure be provided. 11 U.S.C. § 365(b)(1). If rejected, the obligee has an administrative claim for failure to meet post-petition obligations. But there is no indication that an obligee is to be forced, several months af-

---

**5.** While *Theatre Holding*, as it applies to leases, has been legislatively overturned by the passage of § 365(d)(4) in 1984, P.L. No. 98–353, it re- mains good law in this Circuit as to other executory contracts.

ter bankruptcy, to continue to fund someone else's desire for benefit.

Thus, the Committee's assertion that according a first priority to the claims of an obligee for its post-petition expenses incurred after a brief initial period precludes shortening the time to assume or reject has little merit. That one might be paid in full if a plan is confirmed, as required by § 1129(a)(9), hardly recognizes the detriment to its cash flow in the interim. Moreover, Congress, in § 361(3) of the Code overturned *In re Yale Express System, Inc.*, 384 F.2d 990 (2d Cir.1967) and decreed that the furnishing of an administrative claim does not constitute "adequate protection" as that term is employed in the Code. Section 363(d) does not require "adequate protection" of an obligee. But there is no support for the Committee's assertion that granting an administrative priority to an obligee dispells the harm it will suffer.

■ Here, these factors compel that relief be given to WCFL and shape the contours of that relief. That WCFL has already footed a significant portion of Beker's post-petition partnership bills strongly supports the notion that it should not pay Beker's share of fixed costs calculated on a mothballed basis during the period in which the Committee would maximize the price of the Conda Assets through marketing them as it desires.[6] Strongly supporting that conclusion is the notion that general unsecured creditors should not suffer through the imposition of further administrative claims. The threat to WCFL from the possibility of increased fixed costs, were its partner to resume mining during fall 1986, indicates that a condition barring that occurrence is to be attached to the power to assume. As Smith testified

6. Smith's testimony that WCFL will cover at lower cost if it can be protected from paying increased fixed costs apparently assumes that mining will not be recommenced and that the facility will not be kept ready for prompt start-up.

7. For the estate to bear those costs would run the risk that they might not be recoverable under 11 U.S.C. § 506(c). *See In re Flagstaff Foodservice Corporation*, 739 F.2d 73, 76 (2d Cir.

[T]he principal benefits to WCFL [of assumption, should WCFL have an increased equity interest] would be—I think I have to fairly say that if there is no new buyer, if the agreements are not assumed, or if there is a long period, you know, the debenture holders are riding along WCFL's coattails while WCFL pays all the bills hoping for somebody to come along and assume the thing, and then taking the advantage [of the supply contract] and saying aha, WCFL, you did all that but you have to do this much. This is the principal problem we are wrestling with.

(Tr. at 85). The need of the Committee for time to market the Conda Assets, that a sale will need time to close, and that WCFL will have rock to supply its fertilizer plant until its temporary shutdown in September 1986, indicate that a reasonable time is to be set in terms of months rather than days as sought by WCFL. The need for WCFL to find a replacement partner in time to gear up for mining in the spring if the contracts are rejected indicates that the time should end before the end of 1986. The lack of any evidence that the Debtor has any equity in the Conda Assets and that the benefit from further marketing of the Conda Assets is to inure to the creditors whose liens they collateralize indicates that they should bear at least future fixed costs. A debtor in the exercise of its fiduciary duty to the estate as a whole may decide to make payments to preserve an asset. But that a debtor is in bankruptcy should not require other creditors to fund a secured creditor's desire to increase its return.[7]

### IV.

■ To fashion relief reflecting such concerns is the hallmark of equity. While

1984); *In re Trim–X*, 695 F.2d 296, 301, 7 C.B. C.2d 955, 961–62 (7th Cir.1982). As those cases show, recovery under § 506(c) is hardly a certainty, absent consent (see *supra* n. 4), and depends, in part, on the benefit obtained by the secured creditors. That risk would appear to be unreasonable unless there were reasonable opportunity that unsecured creditors would realize a return from the sale of an asset or its use as a basis for reorganization.

no case that proceeds in a manner other than merely setting a date for assumption or rejection has been cited to us, nor have we been directed to any case where the debtor virtually concedes the merits of the motion and the opposition comes from secured creditors who desire that a debtor retain the power to assume in order to exercise it on their behalf all the while incurring significant administrative expense. The notion that secured parties, who have refrained from requesting modification of the automatic stay to permit them to foreclose, should initially foot the bill in order to have time to sell the property within the bankruptcy proceeding, upon a debtor's deciding not to, hardly does violence to § 365 or to the Code in general. Moreover, structuring relief in this manner reflects the notion that secured creditors have the right to foreclose and on foreclosure would incur the expense of maintaining the asset prior to its disposition.

Nor does fashioning relief in this manner do violence to the procedural posture of this case. WCFL needs immediate protection. The Debtor desires to sell the Conda Assets immediately. Hearing on the motion was rescheduled for July 17, 1986 upon the Debtor's announcement that it would sell the Conda Assets and on the Equity Committee's assertion that as a practical matter that the Conda Assets must be disposed of by August 1, 1986 (Tr. 7/14/86 at 3; Tr. 6/5/86 at 21.). The Committee desires delay. The Court agreed with its request to postpone the sale *sine die*. We did so pending resolution of the legal ability of the Debtor's to sell the Conda Assets pursuant to § 363(f) of the Code. The Debtor has determined not to pay Conda Partnership costs. Someone should if further time to assume or reject is desired. To condition delay upon requiring secured creditors to alleviate the harm to the obligee to an executory contract accords with the delay that those secured creditors have requested.

On the instant motion, moreover, the Committee and the Debtor apparently assume that the executory contracts are burdensome to the estate. They make no re-

sponse to WCFL's contention that the Debtor needs to have the issue resolved. At the hearing on August 11, the issue will again be before us. If, at that time or subsequently, it is determined that the property is not burdensome and that the Conda Assets are of benefit to the estate, *see* 11 U.S.C. § 554, the secured creditors should be free to move for the Debtor to be required to assume partnership costs that secured creditors have paid or would pay.

The foregoing constitutes this Court's findings of fact and conclusions of law. The motion is to be granted subject to the concerns noted above. A separate order is being entered.