In re TELIGENT, INC., et al., Debtors.

No. 01–12974 (SMB).

United States Bankruptcy Court, S.D. New York.

Oct. 29, 2001.

Kirkland & Ellis, New York City, James H.M. Sprayregen, Lena Mandel, Matthew N. Kleiman, Anup Sathy, Samuel A. Schwartz, of counsel, for Debtors.

Stern Greenberg & Kilcullen, Roseland, NJ, Herbert J. Stern, Joel M. Silverstein, of counsel, for Movants Graham G. Sampson, Linda Sampson, Sampson Family 2000 Trust, Michael P. Nazaruk, Karin Nazaruk and Nazaruk Family 2000 Trust.

Wasserman, Jurista & Stolz, P.C., Milburn, NJ, Daniel M. Stolz, Harry M. Gutfleish, of counsel, for Movants.

## MEMORANDUM DECISION REGARDING THE ASSUMPTION AND/OR REJECTION OF THE PARTIES' MERGER AGREEMENT

STUART M. BERNSTEIN, Chief Judge.

Section 365(c)(2) of the Bankruptcy Code prohibits a trustee from assuming an executory contract "to issue a security of the debtor." Graham G. Sampson ("Graham"), his wife Linda Sampson ("Linda"), the Sampson Family 2000 Trust (the "Sampson Trust"), Michael P. Nazaruk ("Michael"), his wife Karin Nazaruk ("Karin") and the Nazaruk Family 2000 Trust (the "Nazaruk Trust")(collectively, the "Movants"), contend that § 365(c)(2) prevents the debtor, Teligent, Inc. ("Teligent"), from assuming the parties' merger agreement, described below. In the alternative, they contend that Teligent should be compelled to assume or reject the agreement immediately.

For the reasons discussed below, I conclude that the merger agreement is an executory contract, and § 365(c)(2) does not prevent its assumption. Furthermore, in light of the debtors' current efforts to sell ECI, I will adjourn consideration of the Movants' alternative request for approximately thirty days.

## BACKGROUND

The background to the present dispute is discussed at length in *Sampson v. Teligent, Inc. (In re Teligent)*, A.P. No. 01/8091, 2001 WL 1134729 (Bankr.S.D.N.Y. Sept. 26, 2001)("*Repudiation Decision*"), familiarity with which is assumed.[1] The following discussion highlights the facts relevant to the issues raised by the Movants' application.

### A. The Merger

Prior to the end of September 2000, Executive Conference, Inc. ("ECI") was an independent corporation providing teleconferencing services to its business customers. Graham and Michael each owned 48.75% of ECI, and the two Trusts each owned 1.25%. Graham, Michael and the Trusts are sometimes referred to collectively as the "Shareholders."

On or about September 29, 2000, Teligent, ECI, and the Shareholders entered into an Agreement and Plan of Merger and Reorganization, dated as of August 16, 2000 (the "Merger Agreement")(PX 35). Through the Merger Agreement, ECI would be merged into a newly-created first-tier subsidiary of Teligent, referred to

---

1. In this memorandum, "Tr." refers to the transcript of the repudiation trial held on August 8, 2001, and "PX" and "DX" refer, respectively, to the Movants' and Teligent's exhibits received in evidence at the repudiation trial.

in the Agreement as "Acquisition." (Merger Agreement, p. 1, 2nd WHEREAS clause.) The parties intended the transaction to qualify as a non-taxable reorganization under § 368(a) by virtue of § 368(a)(2)(D) of the Internal Revenue Code.[2] (*Id.*, p. 1, 3rd WHEREAS clause.) To ensure compliance with the Internal Revenue Code, the Merger Agreement required Teligent to pay in excess of 50% of the total merger consideration in Teligent common stock instead of cash. (*Declaration of Graham Sampson*, dated July 17, 2001, at ¶¶ 3–4.)

The Merger Agreement set out three forms of merger consideration. The Initial Merger Consideration, disbursed at the closing, totaled $50.84 million. Teligent paid $25.42 million, or 50%, in Teligent common stock, and satisfied the balance with cash. (Merger Agreement ¶ 2.02(e)(i).) In addition, Teligent had to pay Deferred Merger Consideration in the principal aggregate amount of $19.3 million over the next three years, plus interest at 6% per annum on the unpaid portion. At least 60% was payable in Teligent common stock. (*Id.*, ¶ 2.02(e)(ii).) Finally, Graham was entitled to receive EBITDA Merger Consideration on or before November 30, 2003. The EBITDA Merger Consideration would be based on future earnings, and at least 50% had to be paid in Teligent common stock. (*Id.*, ¶ 2.02(e)(iii).) [3]

The Merger Agreement required Graham and Michael, as well as their non-shareholder spouses Linda and Karin, to execute non-competition and non-disclosure agreements (the "Non–Compete/Non–Disclosure Agreement").[4] (Merger Agreement, Ex. A.) As the name suggests, the Non–Compete/Non–Disclosure Agreements incorporated two restrictive covenants. First, the Restricted Parties could not participate in a competing business in any of the contiguous 48 states for a period of five years.[5] Second, they could not disclose confidential information obtained from ECI. The execution of the Non–Compete/Non–Disclosure Agreements was a condition to closing, (Merger Agreement ¶ 6.01(f); Non–Compete/Non–Disclosure Agreement, 3rd WHEREAS clause), and a material inducement to Teligent's consent to the Merger Agreement. (Non–Compete/Non–Disclosure Agreement, 2nd WHEREAS clause.)

---

2. Section 368(a) deals with tax beneficial mergers and reorganizations. Section 368(a)(2)(D) states:

 **(D) Use of stock of controlling corporation in paragraph (1)(A) and (1)(G) cases.**—The acquisition by one corporation, in exchange for stock of a corporation (referred to in this subparagraph as "controlling corporation") which is in control of the acquiring corporation, of substantially all of the properties of another corporation shall not disqualify a transaction under paragraph (1)(A) [statutory merger or consolidation] or (1)(G)[transfers in a title 11 or similar case] if—
 (i) no stock of the acquiring corporation is used in the transaction, and
 (ii) in the case of a transaction under paragraph (1)(A), such transaction would have qualified under paragraph (1)(A) had the merger been into the controlling corporation.

3. Graham was also entitled to a GS Retention Bonus, based on his continued employment. The GS Retention Bonus was not part of the merger consideration, and was payable in cash. (*See* Merger Agreement, ¶ 5.10.)

4. Graham, Michael, Linda and Karin are sometimes referred to collectively as the "Restricted Parties."

5. The five years began to run for Michael, Linda and Karin on the date they executed their Non–Compete/Non–Disclosure Agreements. Since Graham would continue to work for ECI, his five year restriction started to run when his employment by ECI was terminated for any reason.

Delaware law governed the interpretation of the Merger Agreement, (Merger Agreement ¶ 10.06), as well as the Non–Compete/Non–Disclosure Agreements. (Non–Compete/Non–Disclosure Agreement ¶ III.) Finally, the Merger Agreement, together with the Exhibits and Schedules, represented the "final and complete contract of the parties." (Merger Agreement ¶ 10.03.)

## B. Prior Proceedings

After Teligent and its affiliates filed these chapter 11 cases on May 21, 2001, the Movants commenced an adversary proceeding to obtain a declaration, *inter alia*, that Teligent had repudiated the Merger Agreement prior to the petition date.[6] This led to an expedited trial conducted on August 8, 2001. At its conclusion, I ruled that the Movants had failed to prove a repudiation, and dismissed the complaint. *Repudiation Decision*, 2001 WL 1134729, at *7.

Separately, the Movants initiated this contested matter to address the issues raised by § 365. In the first instance, they maintained that the Merger Agreement and the Non–Compete/Non–Disclosure Agreements form a single agreement that Teligent cannot assume because it is a "contract … to issue a security of the debtor" within the meaning of 11 U.S.C. § 365(c)(2). Moreover, since Teligent cannot assume the Merger Agreement, it cannot assign it. *See* 11 U.S.C. § 365(f)(2)(A). Alternatively, the Movants argued that the debtor should be compelled to assume the Merger Agreement immediately.

Teligent responded with a variety of alternative arguments: the Merger Agreement and the Non–Compete/Non–Disclosure Agreements are separate agreements, whether one or separate, they are not

executory, but even if they are executory, § 365(c)(2) does not bar their assumption. Lastly, Teligent should not be forced to make the assumption/rejection decision at this time.

## DISCUSSION

### A. What is the Contract?

■ Section 365 deals with the assumption and assignment of executory contracts and unexpired leases. The trustee must assume or reject the entire contract, but the parties disagree over whether the Merger Agreement and the Non–Compete/Non–Disclosure Agreements comprise one contract or separate contracts. Under general contract law, the parties' intentions determine whether two separately executed agreements are in reality one. *See Huyler's v. Ritz–Carlton Restaurant & Hotel Co.*, 1 F.2d 491, 493 (D.Del.1924)(applying Delaware law); *Rudman v. Cowles Communications, Inc.*, 30 N.Y.2d 1, 330 N.Y.S.2d 33, 280 N.E.2d 867, 873 (1972)(applying New York law). The same rule applies to assumption and rejection issues under § 365. *See Stewart Title Guaranty Co. v. Old Republic Nat'l Title Ins. Co.*, 83 F.3d 735, 739–41 (5th Cir.1996)(if parties intend a severable contract, the debtor may reject one agreement and not the other)(applying Texas law).

■ This issue was tried as part of the repudiation dispute. Although I did not have to decide it then, the trial record supports the finding that the parties intended the Merger Agreement and the Non–Compete/Non–Disclosure Agreements to be a single contract. First, the Merger Agreement says so. (*See* Merger Agreement ¶ 10.03)(defining the Merger Agreement and its Exhibits, *e.g.*, the Non–Compete/Non–Disclosure Agreement, and

---

6. The Movants also named ECI, a chapter 11 debtor, as a party plaintiff.

the Schedules as the "final and complete contract of the parties"). Second, both sets of documents were executed on the same day and as part of the same transaction. (Tr. 80–81.) Third, neither side would have signed one unless the other side signed the second. The Non–Compete/Non–Disclosure Agreements state that their execution by the Restricted Parties is a condition to the closing and a material inducement to Teligent's willingness to enter into the transaction. In the same vein, Graham testified that he would not have signed the Non–Compete/Non–Disclosure Agreement without Teligent's agreement to buy ECI. "[I]t was all one agreement." (*Id.* at 81.)

That some of the parties signed one of the agreements but not the other is consistent with this intention. Neither Karin nor Linda owned shares in ECI, and therefore, neither signed the Merger Agreement. In fact, they did not work for ECI and had no reason to sign a Non–Compete/Non–Disclosure Agreement, except that Teligent insisted on it, (*see* Merger Agreement ¶ 6.01(f)), doubtless to prevent Graham or Michael from running a competing business using their wives as figureheads. The Trusts, on the other hand, were shareholders in ECI, and hence, signed the Merger Agreement. There would be no reason for the Trusts to sign the Non–Compete/Non–Disclosure Agreements. Finally, only Graham and Michael signed both, but they were the

only two that had interests affected by both. In short, each party signed the part of the overall agreement that touched on that party's rights.

**B. Is the Merger Agreement Executory?**

■ Next, Teligent insists that even if the Merger Agreement includes the Non–Compete/Non–Disclosure Agreements, and there is but one contract, the contract is not executory. In support, Teligent asserts that only two unperformed promises remain: (1) Teligent must pay money, and (2) the Movants must refrain from competing with ECI or disclosing confidential information. Neither obligation, Teligent says, will support executoriness. Assuming that these were the only remaining obligations,[7] the Merger Agreement is nevertheless executory.

■ As discussed in *In re Riodizio, Inc.*, 204 B.R. 417 (Bankr.S.D.N.Y.1997), there are essentially three approaches to executoriness: the Countryman Test, *id.* at 421, the related but less stringent "some performance due" test suggested by the legislative history, *id.* at 424, and the Functional Approach. *Id.* at 422. The Second Circuit has never formally adopted either the Countryman Test or the Functional Approach, *Shoppers World Cmty. Ctr., L.P. v. Bradlees Stores, Inc. (In re Bradlees Stores, Inc.)*, No. 01 Civ. 3934(SAS), 2001 WL 1112308, at *7

7. The Merger Agreement actually spells out numerous other unperformed obligations. For example, Teligent must offer Graham a right of first refusal if it proposes to consummate a sale of ECI prior to September 30, 2003. (*See* Merger Agreement ¶ 5.16.) Furthermore, the Shareholders must furnish any additional information requested to assure compliance with applicable federal and state securities laws in connection with the purchase and sale of Teligent shares. (*Id.,* ¶ 3.32(d).) The Shareholders cannot sell, pledge, dispose of or transfer their Teligent shares received in connection with the merger except under specified circumstances. (*Id.,* ¶ 3.32(i).) None of the parties can take a tax return filing position inconsistent with section 368(a) of the Internal Revenue Code (*Id.,* ¶ 5.12.) Both sides have indemnification obligations. (*Id.,* ¶¶ 8.01, 8.02.) Finally, the parties must execute any and all further documents and instruments necessary and/or appropriate to carry out the terms and provisions of the Merger Agreement. (*Id.,* ¶ 10.10.)

(S.D.N.Y. Sept. 20, 2001), and its most recent pronouncement invoked the "some performance due" test. *Eastern Air Lines, Inc. v. Insurance Co. of Pennsylvania (In re Ionosphere Clubs, Inc.)*, 85 F.3d 992, 999 (2d Cir.1996); *accord Bradlees Stores*, 2001 WL 1112308, at *7. Nevertheless, many courts, including courts in this district, have relied on the Countryman Test, *Bradlees Stores*, 2001 WL 1112308, at *7, under which the "executory contract" means

> a contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other.

Vern Countryman, *Executory Contracts in Bankruptcy: Part 1*, 57 Minn. L. Rev. 439, 460 (1973).

■ The materiality of the breach under the Countryman Test is a factual question resolved through the application of state law. *See Bradlees Stores*, 2001 WL 1112308, at *7; *In re Riodizio, Inc.*, 204 B.R. at 421; *In re Lopez, M.D.S.C.*, 93 B.R. 155, 160 (Bankr.N.D.Ill.1988). In Delaware as elsewhere, a material breach, if uncured, also operates as a failure of condition, and discharges the other party's corresponding duty to perform. *Schutzman v. Gill*, 154 A.2d 226, 230 (Del.Ch. 1959); *Dickinson Med. Group, P.A. v. Foote*, No. 84C–JL–22, 1989 WL 40965, at *7 (Del.Super.Ct. Mar. 23, 1989); *Hudson v. D & V. Mason Contractors, Inc.*, 252 A.2d 166, 170 (Del.Super.Ct.1969).

■ As a rule, Delaware law treats the covenant not to compete and the reciprocal promise to pay as material. As a result, the failure to make payment will discharge the obligation not to compete, *see Dickinson Med. Group*, 1989 WL 40965, at *8 (breach of a payment obligation under a contract containing a covenant not to compete will permit the person giving the covenant the right to suspend performance if the payment obligation is not *di minimis* and goes to the essence of the contract); *cf. Knowles–Zeswitz Music, Inc. v. Cara*, 260 A.2d 171, 174 (Del.Ch.1969)(in action to enforce a covenant not to compete or disclose, the court must decide whether the party seeking to enforce the covenant committed the first breach, thereby relieving the covenant-giver of his obligations), and the breach of the covenant not to compete discharges the obligation to make payment. *See, e.g., Conley v. Dan–Webforming Int'l A/S (Ltd.)*, Civ. A. No. 91–401 MMS, 1992 WL 401628, at *22 (D.Del. Dec. 29, 1992)("[I]f the restrictive covenant has been violated, defendants will not have to pay the commissions during the time in which the covenant was violated"); *accord Van Oort Constr. Co. v. Nuckoll's Concrete Serv., Inc.*, 599 N.W.2d 684, 693 (Iowa 1999)(buyer of business may suspend payments to shareholders as a result of their breach of a covenant not to compete).

This case is no exception to this rule. Teligent's obligation to pay the merger consideration is a substantial performance given, in large part, for the Restricted Parties' reciprocal promise to refrain from competing with ECI or disclosing confidential information.[8] Each performance

---

8. Teligent has consistently argued that Graham's adherence to the restrictive covenant is critically important to ECI's market value. (*Objection to Motion for an Order Deeming Executory Contract Rejected Or, Alternatively, Directing Debtors to Assume or Reject Executory Contract*, dated Aug. 27, 2001, at ¶ 35) ("The release of the Movants from the Non–Compete Agreements obligations and the Movants immediate entry into competition with ECI will greatly jeopardize the Debtors' ability to sell ECI and will irreparably harm the Debtors' ability to realize the full value of

goes to the essence of what the other party sought and expected when he entered into the Merger Agreement, and without it, the party will lose the benefit of the bargain that he thought he struck.

Teligent does not contest the materiality of the remaining obligations. Instead, it invokes a line of bankruptcy authority, primarily *In re Bluman*, 125 B.R. 359 (Bankr. E.D.N.Y.1991) and *In re Drake*, 136 B.R. 325 (Bankr.D.Mass.1992), that reached the opposite result. *Bluman* and *Drake* involved the same basic fact pattern. The debtor sold his business before the petition date, and agreed not to compete with his buyer. In exchange, the buyer agreed to make payments over time. The purchase contract stated, in substance, that if the debtor breached the covenant, the buyer could obtain an injunction in addition to any other available remedy. The debtor subsequently filed a bankruptcy petition, and the question was whether the purchase contract was executory.

In each instance, the court concluded that the contract failed the Countryman Test.[9] Both courts agreed that the debtor's covenant not to compete did not render the contract executory on his side. Quoting *Present v. Glazer*, 225 A.D. 23, 232 N.Y.S. 63 (N.Y.App.Div.1928), *Bluman* observed that the aggrieved buyer of a business is generally limited to an injunction or damages if the seller breaches a covenant not to compete. 125 B.R. at 362. In addition, the language in the remedies clause reflected the parties' intent to limit the remedies in the event of a breach to damages or an injunction. It was notable, according to the court, that the parties did not provide that the breach of the covenant would be a material breach, but even if they did, the court stated, in *dicta*, that the provision would probably be unenforceable as a forfeiture. *Id.* *Drake* reached the same conclusion, citing *Bluman*. *In re Drake*, 136 B.R. at 328.

Interestingly, the two courts reached the opposite conclusion on the buyer's obligation to pay. According to *Bluman*, the buyer still owed a material performance; if it "defaulted on its obligation to make payments to the Debtor, that would be a material default and such breach would excuse the performance of the Debtor." 125 B.R. at 362. *Drake* disagreed, deciding instead that the buyer's sole obligation to pay money did not make the contract executory on the buyer's side. *See* 136 B.R. at 328 (citing *In re Structurlite Plastics Corp.*, 86 B.R. 922 (Bankr.S.D.Ohio 1988)).

Like the *Bluman* court, I concur that the buyer's breach of its payment obligation would be material, making the contract executory on that side. However, I reach a different result on the covenant not to compete, and *Bluman* is inapposite on this point. First, the Non–Compete/Non–Disclosure Agreement says that the Restricted Parties' consent to the restrictions is a "material" inducement to Teligent's own assent to the Merger Agreement. Second, Delaware law does allow a party to suspend payment if the other party breaches a covenant not to compete; the payer is not limited to an injunction or damages. Where the covenant is given in connection with the sale of a business, it is even more likely to be deemed material. A covenant not to compete is often included in a contract to sell a business to protect the purchaser and allow him to enjoy the built-up good will. *Tull v. Turek*, 147 A.2d 658, 662 (Del.1958); RESTATEMENT (SECOND) OF CONTRACTS § 188

---

ECI for the benefit of their estates and creditors.'').

9. Both also ruled that the contract was not executory under the Functional Approach.

cmt. f (1981). Third, under Delaware law, a remedies clause like the one found in both *Bluman* and *Drake* does not limit an aggrieved party's right to other relief unless the clause expressly states that the listed remedies are exclusive. *See Knowles–Zeswitz Music, Inc. v. Cara*, 260 A.2d at 174

*Drake*'s conclusion that the obligation to pay is not executory as to the payer—and the implication that the obligation to pay is, therefore, immaterial—comes from a misreading of the legislative history. According to the House and Senate Reports,

> [a] note is not usually an executory contract if the only performance that remains due is repayment. Performance on one side of the contract would have been completed and the contract is no longer executory.

H.R. Rep. 95–595, at 347 (1977); S. Rep. 95–989, at 58 (1978), U.S.Code Cong. & Admin.News 1978, at 5787, 5844, 6303–04. In *Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc.*, 756 F.2d 1043 (4th Cir.1985), *cert denied*, 475 U.S. 1057, 106 S.Ct. 1285, 89 L.Ed.2d 592 (1986) the Court cited the legislative history in support of *dicta* that "a contract is not executory as to a party simply because the party is obligated to make payments of money to the other party." *Id.* at 1046. The *Lubrizol* language, which many courts have cited, implies that a contract is not executory, even where both parties have substantial unperformed obligations, if one of the parties is obligated only to pay money.

The legislative history does not support this view. Instead, it refers to situations akin to accounts payable and accounts receivable where one party has *fully* performed, and the only remaining obligation is the other party's duty to pay for that performance. *See In re Dunes Casino Hotel*, 63 B.R. 939, 948 (D.N.J. 1986). In contrast, if *both* parties have substantial, unperformed obligations, the contract is executory even though the uncompleted obligation of one of the parties only involves the payment of money. *Id.*[10]

Accordingly, I conclude that the Merger Agreement is executory under the Countryman Test, and *a fortiori*, under the "some performance due" test. Since the Merger Agreement is executory under the Countryman Test, it is unnecessary to consider the more lenient Functional Approach. *Bradlees Stores*, 2001 WL 1112308, at *7.

### C. Is the Merger Agreement Assumable?

#### 1. The "Plain" Meaning of § 365(c)(2)

Having concluded that the Merger Agreement is executory, I must address the more difficult and principal issue: can Teligent assume it? Section 365(c) prohibits the trustee from assuming certain types of contracts. Section 365(c)(2) provides:

> (c) The trustee may not assume or assign an executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or re-

---

**10.** Excluding such contracts could prevent the estate from taking advantage of valuable agreements. For example, suppose that prior to the petition, the debtor entered into a contract to buy a widget for $100.00. The contract remained totally unperformed as of the petition date, by which time the market price of a widget had risen to $150.00.

The contract is a valuable asset. Moreover, neither party has performed, and under state law, either party's failure to perform would be a material breach. However, the estate's only obligation is to make payment. Under the *dicta* in *Lubrizol*, the contract would be nonexecutory and incapable of being assumed.

stricts assignment of rights or delegation of duties, if—

. . . .

(2) such contract is a contract to make a loan, or extend other debt financing or financial accommodations, to or for the benefit of the debtor, or to issue a security of the debtor.

The Movants maintain that the Merger Agreement is a contract "to issue a security of the debtor," while Teligent argues that it is not.

 Where the meaning of a statute is plain, the court must enforce it according to its terms. *United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989). A statute is ambiguous when the text is capable of at least two reasonable readings, or when no one reading is clearly indicated. *See* 2A NORMAN J. SINGER, STATUTES & STATUTORY CONSTRUCTION § 48.01, at 410 (6th ed. rev.2000)("SINGER"). In ascertaining the meaning of the statute, "we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy." *Kelly v. Robinson,* 479 U.S. 36, 43, 107 S.Ct. 353, 93 L.Ed.2d 216 (1986).

"Security," as used in § 365(c)(2), does not present any problem of interpretation. It is defined in the Bankruptcy Code to include both debt and equity instruments, such as notes, stock, treasury stock, bonds and the like. 11 U.S.C. § 101(49). The parties agree that the Teligent common stock, which the debtor is required to deliver to Graham and Michael under the Merger Agreement, is a "security."

Instead, difficulty relates to the meaning of "issue." In its ordinary commercial sense, to "issue" securities or stock means "to emit, put into circulation, or dispose of securities already authorized and prepared for disposition," *Scott v. Abbott,* 160 F. 573, 577 (8th Cir.), *cert. denied,* 212 U.S. 571,

29 S.Ct. 682, 53 L.Ed. 655 (1908)(internal quotation marks omitted); *accord Blythe v. Doheny,* 73 F.2d 799, 803 (9th Cir.1934); *Anadarko Petroleum Corp. v. Panhandle E. Corp.,* 1987 WL 13520, at *4 (Del.Ch. July 7, 1987); 11 TIMOTHY P. BJUR, ET AL., FLETCHER CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 5126, at 175 (Perm. Ed. rev.1995)("FLETCHER"), to a specified shareholder. *Blythe v. Doheny,* 73 F.2d at 803. The commercial usage seems to refer to the disposition of newly created rather than existing stock. *See In re Election of Directors of New York & Westchester Town-Site Co.,* 145 A.D. 630, 130 N.Y.S. 419, 422 (N.Y.App.Div.1911). Finally, while others may transfer a corporation's security, only the corporation appears capable of "issuing" it.

The Movants' argue that the Merger Agreement must be a contract to issue a security of Teligent because the payment of stock consideration was an essential feature of the transaction. In addition, the Merger Agreement refers to Teligent's *issuance* of stock in several places. (*Application in Support of Motion for an Order Deeming Executory Contract Rejected, or Alternatively, Directing Debtors to Immediately Move to Assume or Reject Executory Contract,* dated July 17, 2001, at 10–11)("*Movants' Application* ".)

The language in § 365(c)(2) does not support such a broad reading. First, although both the statute and the Merger Agreement refer to issuing securities, there is no indication that the parties and Congress ascribed the same meaning to the term. Second, the Merger Agreement does not require Teligent to "issue" stock in the usual sense; Teligent could meet its obligations by purchasing stock on the open market, and transferring it to the Shareholders. Third, the Movants use "issue" as a synonym for "transfer," which it

is clearly not. When the drafters intended to use the phrase "transfer," as in the provisions relating to the avoiding powers, they knew how to do so.[11] Fourth, the Movants' interpretation ignores the rest of the subparagraph, and as described below, the balance of the words in § 365(c)(2) provide the key to its meaning.

Teligent's construction of § 365(c)(2), on the other hand, is too narrow. It argues that the "security" clause, like the contracts listed in the preceding clause, refers to a contract that requires a non-debtor party to "issue" a security of the debtor. (*Objection to Motion for an Order Deeming Executory Contract Rejected Or, Alternatively, Directing Debtors to Assume or Reject Executory Contract*, dated Aug. 27, 2001, at ¶ 23)("*Teligent Objection.*") Furthermore, the proscription only applies to the issuance of "new" securities. (*Id.* at ¶ 24.)

Teligent's interpretation is contradicted by the language in the statute. First, the § 365(c)(2) prohibition is not limited to newly issued stock. "Security" includes "treasury stock," and "treasury stock" may refer to *issued* stock that the corporation has since reacquired and presently holds. BLACK'S LAW DICTIONARY 1430 (7th ed.1999); 11 FLETCHER § 5080.80, at 27–28. Second, although "issue" is undefined, there is no

evidence that the drafters intended to deviate from the ordinary meaning under which the corporation is the one that "issues" its own securities.

As a result, neither interpretation is reasonable, and the meaning of § 365(c)(2) is not evident from the words used. The subparagraph is, therefore, ambiguous.

### 2. The Extrinsic Aids to Interpretation

In light of the ambiguity, the focus turns to the extrinsic aids to interpretation. These consist of the circumstances which led to the enactment (pre-enactment history), the events surrounding enactment (enactment history), and subsequent developments (post-enactment history). 2A SINGER § 48.01, at 408–10. In this case, the subsequent history is not helpful, but the pre-enactment and enactment history, taken together, reveal the meaning of § 365(c)(2).

### a. The Former Bankruptcy Act and the Bankruptcy Commission

Section 70b of the former bankruptcy act authorized the trustee to assume or reject executory contracts and unexpired leases. Although the parties could insert specific contract language to nullify the

---

11. "Issue a security" or similar phrases appear throughout the Code. *See, e.g.,* 11 U.S.C. §§ 101(14)(C)(a person is not disinterested if he has acted as an investment banker or an attorney for an investment banker in connection with the "issuance of a security" of the debtor during the three years of the petition date); 346(j)(7)(special tax provisions applying to an equity security "issued" to a creditor); 1123(a)(6)(plan must contain means of implementation which may include the "issuance of securities of the debtor"); 1123(a)(6)(plan must require the debtor's charter to include a provision prohibiting the "issuance of non-voting equity securities"); 1125(e)(safe harbor for certain persons who participate in the "issuance ... of a security, offered or sold under the plan"); 1129(a)(4)(plan must require that court approve any payments for services or expenses to any person "issuing securities ... under the plan"); 1141(a)(confirmation order binds any entity "issuing securities under the plan"); 1146(c)(limiting the imposition of stamp and similar taxes to the "issuance ... of a security" under a confirmed plan); 1231(c)(same); 1166 (making certain provisions of subtitle IV of title 49 applicable to the "issuance ... of securities under a plan"). Unfortunately, neither the use of the phrase nor the legislative history accompanying those sections sheds additional light on what the phrase meant to Congress.

trustee's power,[12] § 70b did not list any categories of contracts that could not be assumed. In particular, it did not prevent the trustee from assuming and assigning personal services agreements or other contracts that could not be assigned under applicable non-bankruptcy law. *See* Julia S. Jansen, *Executory Contracts With Financial Accommodations: A Plea for Bifurcation under 11 U.S.C. § 365,* 71 Wash. U.L.Q. 807, 812 (1993).

The Bankruptcy Commission addressed this shortcoming in its report. Section 4–602(f)(2) of its draft code stated that regardless of whether the contract contained a prohibition or restriction on delegation, the trustee could not assume a contract that called upon the debtor to perform duties that were not delegable under applicable non-bankruptcy law. The accompanying notes explained that the proposal carried out a judicially created exception to existing law, and prevented the trustee from forcing the non-debtor party either to accept personal services from or perform personal services for the debtor or the trustee. REPORT OF THE COMMISSION ON THE BANKRUPTCY LAWS OF THE UNITED STATES, H.R. Doc. No. 93–137, at 158 (1973).

### b. The House and Senate Bills

Congress picked up where the Bankruptcy Commission left off. Section 365(c) of the House bill, H.R. 8200, adopted in July 1977, provided:

(c) The trustee may assume or assign an executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, unless—

(1) applicable law excuses a party, other than the debtor, to such contract

or lease from accepting performance from or rendering performance to the trustee or an assignee of such contract or lease, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties; and

(2) such party does not consent to such assumption or assignment.

H.R. 8200, 95th Cong., 1st Sess. § 365(c)(1977). The accompanying Report by the House Judiciary Committee indicated that the prohibition extended beyond personal services contracts to encompass loan agreements as well:

The purpose of the section, at least in part, is to prevent the trustee from requiring new advances of money or other property. The section ... is not designed to permit the trustee to demand new loans or additional transfers of property under lease commitments. Thus, under this provision, contracts such as loan commitments and letters of credit are non-assignable, and may not be assumed by the trustee.

H.R.Rep. No. 95–595, at 348 (1977), U.S.Code Cong. & Admin.News 1978, at 6304. The Senate's corresponding bill, S. 2266, adopted at the end of October, 1977, included the same language. *See* S. 2266, 105th Cong., 1st Sess. § 365(c)(1977).

Lending groups lauded the intention to forbid the assumption of pre-petition lending agreements, but were troubled by the omission of an express statutory prohibition. Various witnesses and constituencies raised these concerns at the subsequent Senate hearings, making two main points: (1) it would be unfair to permit a trustee to enforce a pre-petition loan or similar agreement, and (2) although the House Report explained that the existing lan-

---

**12.** For example, bankruptcy law enforced *ipso facto* clauses under which a contract terminated if the debtor filed bankruptcy.

guage prevented the assumption of a loan agreement, the Code should expressly say so. *Bankruptcy Reform Act of 1978: Hearings on S. 2266 Before the Subcommittee on Improvements in Judicial Machinery of The Judiciary,* 95th Cong. 521 (1977)(*"Senate Hearings"*)(Statement of Stuart D. Root, Esq.); 858 (Statement of John Creedon, Executive Vice President, Metropolitan Life Insurance Co., representing The American Council of Life Insurance). Others testified that the trustee should also be prohibited from assuming (and assigning) a contract under which the non-debtor was obligated to deliver equipment. *Id.* 576 (Statement of Robert J. Grimmig and John W. Ingraham on behalf of the American Bankers Association and Robert Morris Associates); *see id.* 1215–16 (Statement of the views of the American Association of Equipment Lessors, Inc.).

The statement by the National Association of Real Estate Investment Trusts ("NAREIT") best summarized the shortcomings in the House bill and the evils that might result:

> It is possible to read section 365 as permitting a trustee or debtor to force a lender to lend money to him or even to his assignee based upon a pre-filing commitment. The House Report makes it clear that section 365(e) [13] is intended to prevent a trustee from assuming contracts such as loan commitments but NAREIT believes that this issue is too important to be left to coverage in legislative history and reference to non-bankruptcy law. The statute should be amended to clearly preclude any suggestion that extensions of new credit to a debtor or trustee could be required,

> whether in the form of loans, *securities purchases,* or equipment deliveries....

*Senate Hearings* 718 (emphasis added).

Several witnesses recommended specific statutory language to fix the problem. Some of these proposals introduced the constraint on assuming contracts to issue a security of the debtor. One witness recommended that the definition of executory contract exclude "any contract which is a commitment principally for the loan of money to, or for the purchase of securities from and issued by, the debtor" and that § 365(c) be modified to express a corresponding exception to the trustee's right to assume and assign under a new subparagraph of § 365(c). *Senate Hearings* 522 (Statement of Stuart D. Root, Esq.). Another suggested that a new § 365(b)(4) provide that "[n]otwithstanding anything to the contrary contained in this section, the trustee may not assume an executory contract to make a loan to or to *issue a security of the debtor." Id.* 858 (Statement of John Creedon, Executive Vice President, Metropolitan Life Insurance Co., representing The American Council of Life Insurance)(Emphasis added.) Along the same lines, NAREIT proposed adding § 365(b)(4) to read:

> Notwithstanding anything to the contrary contained in this section, the trustee may not assume an executory contract to make a loan or deliver equipment to or to *issue a security of the debtor.*

*Id.* 718 (emphasis added.) [14]

The Senate listened. It incorporated NAREIT's proposed language *verbatim* into a new § 365(b)(4). [15] The accompany-

---

**13.** Section 365(e) contained a corresponding provision enforcing an *ipso facto* clause in a contract that could not be assumed under § 365(c).

**14.** NAREIT recommended a comparable addition to § 365(e) to reflect a corresponding

exception to the general unenforceability of *ipso facto* clauses.

**15.** The Senate also added the corresponding provision to § 365(e)(2).

ing Report by the Committee on the Judiciary explained the reason for the change:

> The purpose of this subsection is to make it clear that a party to a transaction which is based upon the financial strength of a debtor should not be required to extend new credit to the debtor whether in the form of loans, lease financing, or the purchase or discount of notes.

S.Rep. No. 95–989, at 58–59 (1978), U.S.Code Cong. & Admin.News 1978, at 5844–45.

At this point, the two houses of Congress had passed slightly different versions of the proposed law. The reconciliation process resulted, *inter alia,* in the current version of § 365(c)(2). The sponsors explained that it represented a compromise between § 365(c) in the House bill and § 365(b)(4) in the Senate bill. The new section excluded the language prohibiting the assumption and assignment of an executory contract to deliver equipment, but otherwise adopted the Senate version. 124 Cong. Rec. H 11093 (daily ed. Sept. 28, 1978)(statement of Rep. Edwards); 124 Cong. Rec. S 17409 (daily ed. Oct. 6, 1978)(statement of Sen. DeConcini).

#### c. The Meaning of § 365(c)(2)

■ The meaning of § 365(c)(2) is most clearly reflected in Congress' reaction to the concerns expressed by the witnesses. Where Congress adopts language urged by a witness, it may be assumed that Congress also adopted the intent voiced by the witness. 2A SINGER § 48:10, at 454; *see United States v. Henning,* 344 U.S. 66, 77, 73 S.Ct. 114, 97 L.Ed. 101 (1952)(statement of Veterans' Administrator); *United States v. American Trucking Ass'ns, Inc.,* 310 U.S. 534, 547 & n. 32, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940)(statement

of the Chairman of the Legislative Committee of the Interstate Commerce Commission). The language under consideration began as a proposal suggested by NAREIT and others, entered the statutory process through § 365(b)(4) of the Senate bill, and came finally to a rest in § 365(c)(2) of the Bankruptcy Code. Section 365(c)(2) was intended to deal with a specific fear: forcing a lender to extend *new* cash or *new* credit to a trustee or his assignee through the assumption of a pre-petition financial agreement. Contracts to make loans, extend debt financing, extend financial accommodations or issue a security of the debtor were variations of the type of agreement that raised this concern.

The Senate Report, which carries substantial weight, *see* 2A SINGER § 48.06, at 440–41 ("Committee Reports represent the most persuasive indicia of congressional intent in enacting a statute"), confirms this interpretation. It also expressed worry with forcing the non-debtor to purchase or discount the debtor's notes. While a contract "to issue a security of the debtor" goes beyond these examples, the purpose of § 365(c)(2) remains the same.

■ Accordingly, a contract "to issue a security of the debtor," as used in § 365(c)(2), refers to a pre-petition agreement obligating the non-debtor to advance new cash or credit in exchange for the debtor's note (a debt security) or its stock (an equity security). Section 365(c)(2) does not, however, apply to every contract involving an extension of credit, or by analogy, the issuance of a security. *See* 3 LAWRENCE P. KING, ET AL. COLLIER ON BANKRUPTCY ¶ 365.06[2], at 365–64 (rev. 15th ed.2001). If the extension of credit or the issuance of the security is incidental to a contract for the sale of goods or services, the contract

may be assumed (or rejected) notwithstanding § 365(c)(2). *See id.*

 The Merger Agreement, in this regard, is not a contract "to issue a security of the debtor." It required the Shareholders to deliver their ECI stock to Teligent, and refrain from competition and disclosure. The delivery of the stock is analogous to the delivery of goods, and but for the tax implications, the parties could have accomplished the same result through a sale of ECI's assets instead of a sale of the Shareholders' ECI stock.[16] Similarly, the restrictive covenants are akin to agreements to deliver services, except that the obligation is couched in the negative. In other words, the Merger Agreement requires the Restricted Parties to withhold their services and information from others rather than deliver their services and information to Teligent. Most important, the Merger Agreement does not call upon the Shareholders to deliver new cash or credit in exchange for Teligent's common stock.

The Merger Agreement, in this respect, is no more a contract to issue a security than it is a contract to extend credit. Up to one half of the remaining merger consideration is payable in cash. The Restricted Parties, therefore, continue to honor the restrictive covenants based, in part, on Teligent's promise to pay cash in the future. Understandably, no one argues that this turns the Merger Agreement into a contract to make a loan or extend debt financing or a financial accom-

modation. The promise to deliver stock as well as cash does not change the fundamental nature of the agreement for purposes of § 365(c)(2).

### d. The Motion to Compel Assumption

If the Merger Agreement can be assumed, the Movants insist that Teligent assume or reject it immediately. Section 365(d)(2) provides that the trustee may assume or reject an executory contract, an unexpired lease of residential real property or personal property leases of the debtor at any time before confirmation. On request of any other party to the contract or lease, however, the court may order the trustee to assume or reject within a specified time.[17]

 What constitutes a reasonable time is left to the bankruptcy court's discretion, to be determined on a case-by-case basis in light of the broad purposes of the entire Bankruptcy Code. Relevant considerations include the damage that the non-debtor will suffer beyond the compensation available under the Bankruptcy Code, the importance of the contract to the debtor's business and reorganization, whether the debtor has had sufficient time to appraise its financial situation and the potential value of its assets in formulating a plan, and whether exclusivity has terminated.[18] *Theatre Holding Corp. v. Mauro,* 681 F.2d 102, 105–06 (2d Cir.1982). "Above all, the court should interpret reasonable time consistent with the broad purpose of Chap-

---

16. In fact, Teligent has recently submitted an application to sell ECI's assets rather than the ECI stock.

17. Section 365(d)(2) states:

In a case under chapter 9, 11, 12, or 13 of this title, the trustee may assume or reject an executory contract or unexpired lease of residential real property or of personal property of the debtor at any time before the confirma-

tion of a plan but the court, on request of any party to such contract or lease, may order the trustee to determine within a specified period of time whether to assume or reject such contract or lease.

18. I recently granted the first extension of exclusivity. The debtors demonstrated "cause" for the extension, and none of the Movants objected to the motion.

ter 11, which is 'to permit successful rehabilitation of debtors.'" *In re Dunes Casino Hotel,* 63 B.R. at 949 (quoting *NLRB v. Bildisco & Bildisco,* 465 U.S. 513, 527, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984)).

No one quarrels with the proposition that ECI is a significant asset. On the other hand, the unresolved status of the restrictive covenants prejudices Graham beyond the non-payment of the merger consideration. He represents that he continues to live by the restrictions, and is prevented from re-entering the teleconferencing business. This damages not only his present income but his future prospects as well.[19] (*See Declaration of Graham Sampson Pursuant to Local Rule 9077-1,* dated June 5, 2001, at ¶ 6.) Further, Graham is caught in the timetable dictated by Teligent. The debtors retain exclusivity and control the sale process.

The more difficult question is whether Teligent has had sufficient time to sell this asset. Teligent has indicated that the value of ECI, at least to some, depends upon the continuing enforceability of the restrictive covenants. This makes sense. With the repudiation and § 365(c)(2) issues now resolved, there is greater predictability. Independently, the debtors' have tried to expedite the sale process. They recently submitted an application to auction ECI's assets without first securing a "stalking horse" bid. Under their proposal, bidders will have to designate which contracts the debtors must assume and assign in connection with the asset sale. It is not possible to determine at this time whether any bidder is apt to designate the Merger Agreement. The cure costs may be substantial, and the benefits hard to calculate.

Accordingly, the Movants' motion for immediate assumption or rejection will be adjourned for approximately thirty days to give the auction process a bit more time to play out. At the end of that period, the parties can advise the Court on the progress of the auction process. The Court can reconsider at that time whether to fix a decision date in light of the sales efforts and the likelihood that the potential purchasers will insist on the assumption and assignment of the Merger Agreement.

For all of the foregoing reasons, the Movants' motion to declare that the Merger Agreement cannot be assumed is denied. Their alternative motion to compel Teligent to assume or reject Merger Agreement immediately is adjourned for approximately thirty days to a specific date in time to be fixed by the Court upon consultation with the parties. Settle order on notice.

19. None of the other Restricted Parties have offered proof of prejudice if I do not compel Teligent to assume or reject the Merger Agreement immediately. In any event, Michael has apparently retired, as was his intention when he and Graham began to discuss the sale of ECI, *see Repudiation Decision,* 2001 WL 1134729, at *1, and neither Linda nor Karin worked in the teleconferencing business.