## In re ADELPHIA COMMUNICATIONS CORP., et al., Debtors.

### No. 02–41729 (REG).

United States Bankruptcy Court,
S.D. New York.

March 31, 2003.

Proskauer Rose LLP, by Bradley I. Ruskin, John W. Ritchie, Jeffery W. Levi-

tan, Karen Coombs, New York City, for ML Media Partners, LP.

Willkie Farr & Gallagher, by Roger D. Netzer, Michael W. Leahy, New York City, for Adelphia Communications Corp. and Century Communications Corp.

Daniel J. Aaron, P.C., by Daniel J. Aaron, New York City, for Century/ML Cable Venture.

*DECISION AND ORDER ON MOTION FOR ORDER (1) COMPELLING DEBTORS TO ASSUME OR REJECT RECAP AGREEMENT, AND (2) IF RECAP AGREEMENT IS NOT ASSUMED BY OCTOBER 1, 2002, DIRECTING THAT ML MEDIA IS MANAGER OF CABLE TELEVISION SYSTEMS.*

ROBERT E. GERBER, Bankruptcy Judge.

This contested matter, in the jointly administered chapter 11 cases of Adelphia Communications Corporation ("Adelphia") and its subsidiaries, involves Adelphia and its indirect subsidiary Century Communications Corporation ("Century," and together with Adelphia, the "Debtors"). ML Media Partners, L.P. ("ML Media")— which is Century's partner in a joint venture operating two cable television systems in Puerto Rico (the "Systems"), and the counter-party to a "Leveraged Recapitalization Agreement" (the "Recap Agreement"), which ML Media entered into with, *inter alia*, each of Adelphia and Century, in December 2001—moves, pursuant to Bankruptcy Code section 365(d)(2), to compel Adelphia and Century to assume or reject the Recap Agreement (assuming that it is executory) "forthwith." ML Media further seeks an order directing that if the Recap Agreement is not assumed by October 1, 2002 (a date which now has passed), ML Media becomes, until the time of assumption, manager of the Systems.

For the reasons set forth below, the Court determines, with respect to the first prong of ML Media's motion, that the requested order requiring assumption or rejection of the Recap Agreement should be granted, but that assumption or rejection should not be required as quickly as ML Media desires; instead, assumption or rejection shall be made within 90 days of the date of the order on this decision. The Court further determines, with respect to the second prong of ML Media's motion, that an order directing that ML Media now become Manager of the Systems should be denied.

Accordingly, the motion is granted in part and denied in part. The following are the Court's Findings of Fact, Conclusions of Law, and bases for the exercise of its discretion in connection with the motion.

**Facts**

*1. The Cable Venture*

Century, which was acquired by Adelphia in 1999 and is, as noted, now a wholly owned and controlled indirect subsidiary of Adelphia, is the owner of a 50% interest in a joint venture, Century/ML Cable Venture (the "Cable Venture"); the remaining 50% interest in the Cable Venture is owned by ML Media, a limited partnership in which the limited partnership interests are widely held and publicly traded.

As a joint venture, the Cable Venture has the characteristics in law, at least in most respects, of a partnership. As noted, the Cable Venture, directly or through the ownership of stock, owns and operates the Systems.

*2. Joint Venture Agreement*

The Cable Venture was organized under an agreement dated January 1, 1994 (the "Joint Venture Agreement"). Under the Joint Venture Agreement, although Centu-

ry had day-to-day responsibility for the management of the Systems, that day-to-day management was subject to oversight and supervision of a Management Board, with four seats, of which each of ML Media and Century had two. Section 7.4 of the Joint Venture Agreement provided that ML Media would maintain "significant control" over the Joint Venture, and that Century, as manager, was required to consult with, and obtain the approval of, the ML Media Management Board representatives on "all significant matters relating to the Systems."

Section 12 of the Joint Venture Agreement provided for a means for ML Media to be "cashed out" of the Cable Venture. It provided, in relevant part:

(a) Notwithstanding anything in this agreement to the contrary, at any time or times ML Media may request, by notice to Century, that (i) Century purchase ML Media's interest in the Joint Venture, (ii) the Joint Venture and the Subsidiary sell all of the assets and business of the Cable Division, or (iii) the Joint Venture sell all of the assets and business of [a division unrelated to this controversy].

(b) If ML Media makes a request under section 12(a)(i) or under both sections 12(a)(ii) and 12(a)(iii), the following shall apply:

(i) Century shall elect ... to either (x) cause the Joint Venture and the subsidiary to sell all of the assets and business of the Cable Division and the [unrelated division] for prices and at times consistent with prudent business practice (and approved by ML Media), or (y) purchase, or cause the Joint Venture to purchase (ML Media concurring in such purchase), all of ML Media's interest in the Joint Venture for a purchase price equal to the fair market value of the interest, payable in cash at the closing of the purchase.

Thus, upon an ML Media request, Century had to do one or another of two things: either (1) purchase ML Media's interest in the Cable Venture at its fair market value, as determined by an appraisal, or (2) together with ML Media, sell the Systems to the highest third party bidder.

3. *Disputes between ML Media and Century Under the Joint Venture Agreement*

After ML Media's request, Century elected to sell the Systems, but then, in ML Media's view, wrongfully interfered with ML Media's sale rights, including, allegedly, claiming the right to participate in the sale process as a buyer (as to which Century presumably would have an interest in paying the lowest possible price), at the same time that Century was on the seller side (as to which Century presumably would have an interest, and/or duty, to secure the highest possible price), thus placing itself, at least in ML Media's view, in an "irredeemable conflict of interest."[1]

Additionally, disputes arose between ML Media, on the one hand, and Adelphia and Century, on the other, with respect to the management of the Cable Venture, especially with respect to ML Media's belief (thereafter at least partially substantiated, in state court litigation) that Adelphia and/or Century had disregarded ML Media's rights under the Joint Venture Agreement, excluding ML Media from management of the Cable Venture, and failing to provide ML Media with information with respect to the Systems' operations.

1. Affidavit of Elizabeth McNey Yates, dated June 12, 2002 ("Yates Aff."), ¶ 21.

### 4. The Initial Action

The disputes described above led to the filing by ML Media of a state court lawsuit (the "Initial Action"), removed, after Century's chapter 11 filing, to this Court.[2] The Initial Action, which was commenced in March 2000, was brought in the Supreme Court of the State of New York, New York County, by ML Media against Century, Adelphia, and Arahova Communications, Inc. ("Arahova"), another Adelphia subsidiary and another of the Debtors in these cases. ML Media sought, among other things, remedies for Adelphia's alleged violations of ML Media's management rights, and a declaration that Adelphia, Century and their affiliates could not bid on the assets and business of the Cable Venture. The Initial Action was litigated before New York Supreme Court Justice Ira Gammerman.

On July 12, 2000, Justice Gammerman granted ML Media's motion for partial summary judgment, and enjoined Adelphia from interfering with a sale of the Cable Venture through an arms' length transaction with a third party unaffiliated with Adelphia. Thereafter, on July 25, 2000, ML Media also moved for an order requiring Adelphia to honor ML Media's management rights under the Joint Venture Agreement. That motion led to the entry of a consent order, signed by Justice Gammerman on August 1, 2000 (the "Consent Order"), providing ML Media with at least much of the relief ML Media had sought in its management rights motion. The Consent Order imposed a fair number of specifically articulated requirements that would be imposed upon Century and Adelphia with respect to the management of the Cable Venture.

After further disputes between ML Media, on the one hand, and Adelphia and Century, on the other, ML Media moved, on October 26, 2000, for an order holding Adelphia in contempt for violations of the Consent Order. The contempt motion was litigated before a state court Special Referee, who made a number of findings adverse to Century and Adelphia. He found that Adelphia had violated the Consent Order in four respects—by:

(1) unilaterally deciding after the Consent Order was entered to commit to an upgrade of the digital converters it was purchasing for the Systems, at a cost of $1.6 million, without the approval of, or consulting, ML Media;

(2) failing to provide to ML Media a proposed operating budget with appropriate supporting detail;

(3) engaging in fifteen line extension projects after the Consent Order was entered, at least two of which involved expenditures in excess of the $50,000 threshold for which consultation with ML Media was required, while informing ML Media that no line extensions were being done; and

(4) performing a rebuild of 19 miles of one of the Systems, after the entry of the Consent Order, at a cost of approximately $750,000, without either the written approval of ML Media or an approved budget.

On April 30, 2001, Justice Gammerman confirmed the Special Referee's report, and adjudicated Adelphia in contempt.[3]

### 5. Settlement of the Initial Litigation

In December 2001, after those determinations adverse to Adelphia and Century had been made by the Special Referee and

---

2. Adv. Proc. No. 02–2543 (previously Supreme Court, New York Co., Index No. 601298/00).

3. Yates Aff. ¶ 27.

Justice Gammerman, the Initial Action was settled, with the execution of a Stipulation of Settlement ("Settlement Agreement") and the Recap Agreement, both dated December 13, 2001.[4]

### 6. The Recap Agreement

The parties to the Recap Agreement were ML Media, the Joint Venture, Century, Adelphia, and Highland.[5] Under the Recap Agreement, the Joint Venture obligated itself to redeem ML Media's share of the Cable Venture (the "ML Media Share") on September 30, 2002, subject to acceleration (the "Closing Date"), as discussed in the Court's two earlier decisions in the removed adversary proceedings relating to this matter,[6] for a price, subject to upward adjustment, of $275 million.[7] Highland obligated itself to arrange for the Joint Venture to obtain up to $300 million of debt financing in order to finance the redemption of the ML Media Share,[8] with, Highland, Adelphia and Century jointly and severally liable to provide the Cable Venture with sufficient funds to pay interest on any indebtedness incurred in connection with the redemption financing.[9]

The Recap Agreement further provided that Adelphia was required to purchase the ML Media Share on the next business day after the Closing Date if the Cable Venture failed to close on its obligation to buy out the ML Media Share for any reason.[10] (That date would be October 1, 2002, if there were no acceleration, or the day after any accelerated date for the Cable Venture, if there were.) The Recap Agreement further provided, as relevant here, that time was of the essence with respect to the obligations of the Cable Venture, Adelphia, Century and Highland;[11] that following the Closing Date (at the latest, October 2, 2002), Adelphia and Century would no longer have any of the additional management-related rights granted under the Recap Agreement;[12] and should the Cable Venture fail in its obligation to close on or before the Closing Date and Adelphia fail to close the next business day, ML Media would immediately become the full manager of the Systems.[13]

With the execution of the Settlement Agreement and Recap Agreement (and, ML Media contends, in return for the date certain by which ML Media would be able to liquidate its investment at the agreed-on price), ML Media suspended certain of the rights that it otherwise would have had under the Joint Venture Agreement. ML Media suspended the litigation of the Initial Action, and agreed to reduce its management rights pending the Closing Date

---

**4.** Yates Aff. Exh. C (Settlement Agreement), Exh. A (Recap Agreement, cited as "Recap Agmt.").

**5.** Recap Agmt. at 1.

**6.** See ML Media Partners, LP v. Century/ML Cable Venture, (In re Adelphia Communications Corp.), 285 B.R. 127 (Bankr.S.D.N.Y. 2002) (denying motion, inter alia, to remand claims against Cable Venture and Highland to state court) ("ML Media I") and ML Media Partners, LP, v. Century/ML Cable Venture, (In re Adelphia Communications Corp.), 287 B.R. 605 (Bankr.S.D.N.Y.2003) (denying both side's motions for summary judgment with respect to acceleration of duty to buy out ML Media) ("ML Media II").

**7.** Recap Agmt. at § 2.1.

**8.** Recap Agmt. at § 8.8(a).

**9.** Recap Agmt. at § 8.8(b).

**10.** Recap Agmt. at § 1.2.

**11.** Recap Agmt. at § 3.2.

**12.** Recap Agmt. at §§ 8.3, 8.7.

**13.** Recap Agmt. at § 1.4.

under the Recap Agreement; it agreed that Century and Adelphia would have the day-to-day management of the Cable Venture, and that ML Media would have a dramatically reduced management and supervisory role.

The Recap Agreement further provided a number of safeguards in the event of non-performance by the last possible Closing Date, including joint and several liability for all defendants for any failure to redeem ML Media's interest; the immediate reinstatement of the Initial Action should the redemption not occur as scheduled; and ML Media's automatic assumption of full managerial rights over the Systems [14]—managerial rights even greater than ML Media would have had under the Joint Venture Agreement before execution of the Recap Agreement.

As further security for the sums that would have to be paid to ML Media under the Recap Agreement, ML Media was granted a security interest in Century's 50% interest in the Cable Venture.[15] The Recap Agreement provided ML Media the additional remedy of the right to foreclose on that security interest,[16] though, of course, after Century's chapter 11 filing, this would be a measure at least initially prohibited by reason of the Bankruptcy Code's automatic stay.

### 7. Recap Agreement Action

ML Media contended that the dates for the Cable Venture, Adelphia, Century, and Highland to perform their respective obligations under the Recap Agreement were accelerated to dates even earlier than the September 30 and October 1 dates noted above, and (by reason of an asserted "change of control" resulting from the resignation as officers and directors of members of the Rigas Family, and/or defaults on other indebtedness), believed that it thus had the right to require the buyout of its interest, at the $275 million price or as the price might otherwise be adjusted, from and after May 2002. ML Media brought a second action to enforce asserted rights in that regard. That second action (the "Recap Agreement Action"), premised on rights under the Recap Agreement as contrasted to the Joint Venture Agreement, was filed in state court on June 12, 2002, two days after the June 10 filing by Century of a chapter 11 petition with this Court, and was initially brought by ML Media against the Joint Venture, Adelphia and Highland.

Just before the June 10 filing of Century's chapter 11 petition, Adelphia and Century had moved for a Temporary Restraining Order ("TRO") and a preliminary injunction in the Initial Action before Justice Gammerman in state court o protect their interests with respect to the Joint Venture. However, they withdrew their request for the TRO after hearing the condition under which Justice Gammerman would be willing to grant the TRO—that Adelphia, Century and Arahova "rescind all agreements relating to a change of control of any of [them]." [17] A hearing on the preliminary injunction motion in the state court was set for June 13, and on June 12, plaintiff ML Media filed its own motion for a TRO and preliminary injunction with Justice Gammerman (seeking to step in as manager, by reason of an alleged acceleration event), who set both

---

14. Recap Agmt. at §§ 1.4, 8.3(a).

15. Yates Aff., Exh. D ("Security and Pledge Agreement"), at pages 1–2.

16. Recap Agmt. at § 2.4.

17. Proskauer Rose LLP letter, dated June 14, 2002, at page 1.

motions for hearing on June 14.[18]

On June 13, just before any of the motions would be heard by Justice Gammerman, both state court actions were removed by defendant Century to this Court.[19] On June 14, 2002, ML Media renewed its efforts to get the relief it had requested in state court by bringing the same requests to this Court. After a hearing before this Court, ML Media's request to take over as manager of the Systems was denied, principally by reason of concerns on this Court's part as to irreparable injury to ML Media, and a balancing of the hardships to each party.

However, ML Media won the next battle. On June 17, Century brought an "Emergency Motion to Reinforce the Automatic Stay to Enjoin Threatened Disbursement of Escrow Agreement" (the "Century Escrow Motion"), attempting to enjoin the disbursement of $10 million that had been placed in escrow by Highland, which could be drawn down on by ML Media in the event of an alleged event of default. For reasons related to limitations on the power of a bankruptcy court to enjoin a draw-down on funds that had been placed in escrow (in contrast to a determination as to the merits of the underlying dispute), this Court denied Century's motion, and permitted disbursement of the $10 million to ML Media.

Thereafter, the Court denied ML Media's motion to remand the claims in the Recap Action that had been asserted against the Cable Venture and Highland, or alternatively to abstain with respect to them,[20] and denied both sides' motions for summary judgment with respect to their positions as to acceleration.[21] However the Court ruled, in the Acceleration Decision, that the Closing Date took place no later than September 30, 2002 (with respect to the Cable Venture), and October 1, 2002 (with respect to the other parties), and that as a result, they were in default of their obligations under the Recap Agreement (subject, of course, to any limitations under the Bankruptcy Code with respect to remedies therefor, and subject to any rights under the Bankruptcy Code to cure defaults) by reason of the failures to make payment to ML Media on the Closing Date.[22] The Court said in that regard:

> [S]ummary judgment is granted to the extent of determining that assuming that the Recap Agreement is enforceable, payment by the Cable Venture was due on September 30, 2002 (and payment by Adelphia, Century and Highland was due on October 1, 2002, one day later), and that, having failed to make payment, each of the Cable Venture, Adelphia, Century and Highland is now in default.

*M.L. Media II*, 287 B.R. at 620.

After the denial of its motion seeking the removal of Century and Adelphia from the management of the Systems, ML Media made a number of requests, sought by conference in connection with the Recap Action, for the Court to intervene to require Century and Adelphia to provide ML Media with information with respect to the management of the Systems. The Court ruled, informally, that such information had to be provided.

---

**18.** *Id.* at 2.

**19.** Upon amendment of the complaint after removal to this Court, Century was named as a defendant in the Recap Agreement Action as well.

**20.** *ML Media I*, 285 B.R. at 129.

**21.** *ML Media II*, 287 B.R. at 608.

**22.** *Id.*

### 8. Chapter 11 Filings

As previously noted, Century filed its chapter 11 petition on June 10, 2002,[23] shortly before the scheduled June 13, 2002 hearing on the preliminary injunction sought by ML Media in state court, before Justice Gammerman. About two weeks later, on June 25, the remainder of Adelphia's chapter 11 cases were filed.[24] Adelphia was one of the many entities that then filed, and the chapter 11 cases of the various Adelphia entities, including Century, have been jointly administered since that time.

Thereafter, the Cable Venture filed its own chapter 11 petition, making it too a debtor in this Court.[25] ML Media disputed the propriety of that filing, however, and has moved to dismiss it, under Bankruptcy Code section 1112(b), for cause. The Cable Venture's case has not been jointly administered with the other Adelphia cases.

Neither Adelphia nor Century has yet assumed or rejected the Recap Agreement. ML Media has sought an order of this Court, in the umbrella chapter 11 cases, requiring assumption or rejection of the Recap Agreement, forthwith, if (as now has turned out to be the case), ML Media was not bought out by October 1.

### 9. Other Facts Relevant to Assumption or Rejection

Each of the Cable Venture and Century advised the Court, on oral argument on this motion, of its intention to assert that the Recap Agreement is unenforceable as a fraudulent conveyance. By answers filed January 27, 2003 (after the briefing and argument on the motion), each of the Cable Venture, Adelphia and Century raised, as defenses in the Recap Agreement Action, assertions that the Recap Agreement was unenforceable for that reason.[26] Assuming, without deciding, that the Recap Agreement is unenforceable, and thus were to fall away, it would at least appear that the Initial Action settlement would disappear, and ML Media would once more have the rights it had been asserting in the Initial Action, including, *inter alia,* those it might have under the Joint Venture Agreement and Consent Decree.

Finally, the Court notes an additional fact, relevant to the ability of Adelphia and Century to make business decisions of the type that would need to be made under ML Media's motion. From May 2002 and thereafter, throughout the litigation of the issues described above and until only about three weeks ago, Adelphia and Century have been under interim, caretaker, management. Upon the resignation of John Rigas and the other members of his family who were officers and directors of Adelphia and its subsidiaries, one of the remaining directors, Erland Kailbourne, took over to serve as an interim Chief Executive Officer, but he was lacking in experience in the cable television industry. The non-Rigas members of Adelphia's Board determined to employ new senior management, former AT & T Broadband executives William Schleyer and Ronald Cooper, as Chief Executive Officer and Chief Operating Officer, respectively, but the terms of the proposed retention engendered opposition. It was only after an evidentiary

---

**23.** Case No. 02–12834.

**24.** The lead case in the Adelphia cases is Case No. 02–41729.

**25.** Case No. 02–14838.

**26.** Based on review of its docket, *see* Fed. R.Evid. 201(b)(1), the Court takes judicial notice that the Cable Venture, Adelphia and Century have made those assertions; needless to say, the Court makes no findings as to the assertions' merits.

hearing extending over five days, and a decision announced on March 4, that the employment of Messrs. Schleyer and Cooper was approved. Until that time, the Debtors' ability to engage in strategic planning was materially impaired, and it is reasonable to assume that even after their employment, major decisions cannot be made instantly.

### Discussion

As previously noted, ML Media seeks an order of this Court, pursuant to Bankruptcy Code section 365(d)(2), requiring the Debtors Adelphia and Century to assume or reject the Recap Agreement "forthwith." ML Media additionally seeks an order, for the pendency of any period of delay before assumption, directing that ML Media manage the Systems. The Court takes those two points in turn.

### I.

Section 365(d)(2) of the Bankruptcy Code provides, in relevant part, as follows:

> In a case under Chapter 9, 11, 12, or 13 of this title, the trustee may assume or reject an executory contract ... of the debtor at any time before the confirmation of the plan, but the court, on request of any party to such contract or lease, may order the trustee to determine within a specified period of time whether to assume or reject such contract....

11 U.S.C. § 365(d)(2).

Thus, under section 365(d)(2), a chapter 11 debtor-in-possession ordinarily has until plan confirmation to decide whether to assume or reject an executory contract. However, under that same section, a counter-party to an executory contract may request an order compelling the

debtor to assume or reject the contract by an earlier time.

Section 365(d)(2) allows the trustee or debtor-in-possession a reasonable time within which to determine whether assumption or rejection of an executory contract would be beneficial to an effective reorganization, see *In re Beker Industries Corp.*, 64 B.R. 890, 897 (Bankr. S.D.N.Y.1986) (Buschman, J.), and it is the clear policy of the Bankruptcy Code to provide the debtor with breathing space following the filing of a bankruptcy petition, continuing until the confirmation of a plan, in which to assume or reject an executory contract. See *In re Enron Corp.*, 279 B.R. 695, 702 (Bankr.S.D.N.Y.2002) (Gonzalez, J.) But as Judge Gonzalez noted in *Enron*, "the breathing space afforded to the debtor for the assumption or rejection of executory contracts is not without limits." *Id.* The determination of what constitutes a reasonable time to assume or reject is within the bankruptcy court's discretion based on the particular facts of each case. See *In re Burger Boys*, 94 F.3d 755, 760 (2d Cir.1996) (in context of debtor-lessee's motion to extend section 365(d)(4) period); *Theatre Holding Corp. v. Mauro (In re Theatre Holding Corp.)*, 681 F.2d 102, 105 (2d Cir.1982) (in context of motion by landlord, prior to 1984 enactment of section 365(d)(4), to shorten debtor-lessee's time to assume or reject commercial lease); *In re Teligent, Inc.*, 268 B.R. 723, 738 (Bankr. S.D.N.Y.2001) (Bernstein, C.J.) (in context of motion by counter-parties to merger agreement for order, *inter alia*, requiring that debtor should assume or reject merger agreement immediately).

The factors that have been considered in applying this discretion have been expressed in somewhat different ways, and in different contexts.[27] An early articula-

---

**27.** The Second Circuit spoke most recently in the area in the context of a debtor's motion

for an extension under section 365(d)(4), *see Burger Boys*, 94 F.3d at 758, and there relied

tion of factors to be considered, relying on earlier caselaw under the now-repealed Act, included:

(1) the nature of the interests at stake; *Beker Industries,* 64 B.R. at 896, quoting a Chapter XI case, *In re Midtown Skating Corp.,* 3 B.R. 194, 198 (Bankr.S.D.N.Y.1980) (Babbitt, J.);

(2) the balance of hurt to the litigants; *Beker Industries,* 64 B.R. at 896;

(3) the "good to be achieved"; *id.;*

(4) the safeguards afforded to the litigants; *id.* and

(5) "whether the action to be taken is so in derogation of Congress' scheme that the court may be said to be arbitrary." *Id.*

The more recent decisions have identified:

(6) the debtor's failure or ability to satisfy post-petition obligations; *cf. Burger Boys,* 94 F.3d at 761 ("whether the debtor was paying for the use of the property," internal quotations omitted); *Theatre Holding,* 681 F.2d at 105 (noting, in connection with its affirmance of Bankruptcy Judge Schwartzberg's determination to require assumption or rejection within 30 days, that the debtor was not paying for use of the property);

(7) the damage that the non-debtor will suffer beyond the compensation available under the Bankruptcy Code, *see Burger Boys,* 94 F.3d at 761; *Theatre Holding,* 681 F.2d at 105–106; *Teligent,* 268 B.R. at 738;

(8) the importance of the contract to the debtor's business and reorganization; *Teligent,* 268 B.R. at 738; *cf. Burger Boys,* 94 F.3d at 761 ("whether the lease is the debtor's primary asset"); Theatre Holding, 681 F.2d at 106 (fact that lease was Theatre Holding's primary asset);

(9) whether the debtor has sufficient time to appraise its financial situation and the potential value of the assets in formulating a plan; *Teligent,* 268 B.R. at 738; *see also Burger Boys,* 94 F.3d at 761 ("whether the debtor has had sufficient time to formulate a plan of reorganization");

(10) whether there is a need for judicial determination as to whether an executory contract exists; *Burger Boys,* 94 F.3d at 761 (identifying, as a factor on a section 365(d)(4) determination, "the need for judicial determination whether a lease exists");

(11) whether exclusivity has been terminated; *Teligent,* 268 B.R. at 738; and

(12) "above all," the purpose of Chapter 11, to permit successful rehabilitation of debtors. *Teligent,* 268 B.R. at 738–739.

ML Media and the Debtors differ with respect to the result that should follow by reason of the applicable factors, and also with respect to another contention advanced by ML Media—that from and after October 1, 2002, the Recap Agreement

---

heavily on its earlier decision in *Theatre Holding,* in a different, but only slightly different, situation of a motion by a lease counter-party to shorten the time (which at the time was unlimited) to assume or reject. *See Theatre Holding,* 681 F.2d at 104. Cases at the bankruptcy court level, *Teligent, see* 268 B.R. at 738, and *In re Beker Industries Corp.,* 64 B.R. 890 (Bankr.S.D.N.Y.1986) (Buschman, J.), likewise involved motions by an executory contract counter-party to shorten the time that would otherwise apply. The *Burger Boys*

court stated expressly that it regarded the *Theatre Holding* criteria as "still relevant," and Judge Bernstein, in *Teligent,* and Judge Buschman, in *Beker Industries,* likewise relied on *Theatre Holding.* As Judge Buschman commented in *Beker Industries:*

> While *Theatre Holding,* as it applies to leases, has been legislatively overturned by the passage of § 365(d)(4) in 1984, P.L. No. 98–353, it remains good law in this Circuit as to other executory contracts
>
> 64 B.R. at 898 n. 5.

would terminate, and that, as a consequence, would no longer be executory—requiring assumption or rejection "forthwith" for that reason as well.

Because a determination in ML Media's favor on the second point could moot out the need to consider the first, the Court considers ML Media's "termination" contention first.

### A.

 It is undisputed that even if the duty to pay ML Media the $275 million (subject to upward adjustment) was not accelerated, each of Adelphia and Century had that duty, which has not been satisfied, from and after October 1, 2002. As noted above, this Court ruled in *ML Media II* that

> [S]ummary judgment is granted to the extent of determining that assuming that the Recap Agreement is enforceable, payment by the Cable Venture was due on September 30, 2002 (and payment by Adelphia, Century and Highland was due on October 1, 2002, one day later), and that, having failed to make payment, each of the Cable Venture, Adelphia, Century and Highland is now in default.

*M.L. Media II,* 287 B.R. at 620.

 Likewise, it is undisputed that a contract cannot be executory under the Bankruptcy Code when, by its own terms, the contract has terminated, or is scheduled to terminate, as a matter of law. The Court does not agree, however, that the Recap Agreement terminated under its own terms on October 1.

The Court comes to this view for three separate reasons. The first, and most important, is the language of the Recap Agreement itself. October 1, 2002 was the prescribed Closing Date, on which a duty on the part of each of Adelphia and Centu-

ry to pay ML Media matured, but ML Media has not pointed to language in the Recap Agreement providing in words or substance that if payment was not made on October 1, the Recap Agreement would terminate on that day. To the contrary, the Recap Agreement expressly provided for post-Closing Date consequences if a closing did not occur on that date. *See* Recap Agreement § 1.3 (providing for remedies, and waivers of arguable rights on the part of Adelphia with respect to remedies, in the event of a failure on the part of Adelphia to close); § 1.4 (providing for termination of Adelphia's right to manage, and that "Seller [ML Media] automatically shall become the manager of the Systems"); § 1.5 (providing for transfer of management to ML Media, and payment to ML Media of a management fee); § 8.5 (indemnification upon default); § 12.8 (specific performance). While, upon a failure by Adelphia to pay, ML Media presumably could assert at least some of those rights under common law (without express agreement that it had the right to do so), the parties expressly provided for giving ML Media enumerated rights at times after the duty to close matured.

The second is that the unsatisfied obligation was a duty to pay ML Media, which, if Adelphia and Century had the desire and means to do so, either could cure. Section 365(b)(1) expressly provides that right, subject to safeguards for the contract counter-party and limitations, in that section and in section 365(c).

The third is that ML Media itself wishes to invoke rights under the Recap Agreement (in contrast to declaring it void and proceeding as if the Initial Action settlement had never taken place), as ML Media does, for example, with its rights under § § 1.4 and 1.5 to secure management of the Systems. ML Media's efforts to enforce specific aspects of the Recap Agree-

ment at this time are hardly consistent with the notion that the Recap Agreement already terminated by its terms.

The cases cited by ML Media in support of its contention are easily distinguishable. Those cases involved contracts that were leases, insurance policies, or agreements that had set beginning and end dates, that would lapse automatically, according to their terms, on a pre-determined date, leaving no obligations outstanding on either side. *See, e.g., In re Trigg*, 630 F.2d 1370, 1374 (10th Cir.1980) (lease); *In re Hertzberg*, 106 B.R. 131 (Bankr.E.D.Mich. 1989) (insurance policy); *Salzer v. Jocquel Supply*, 180 B.R. 523 (Bankr.N.D.Ind. 1993) (lease); *Gloria Mfg. Corp. v. ILG-WU*, 734 F.2d 1020 (4th Cir.1984) (collective bargaining agreement). Here, by contrast, the Recap Agreement was a contract that, in addition to prescribing rights and obligations for the period before the Closing Date, created a duty to pay at a prescribed time. The Recap Agreement did not provide for an expiration and/or termination; the October 1 date was a Closing Date—a date for performance of an obligation, not a date marking the end the contractual relationship—and, as noted above, provided for numerous post-Closing Date rights and obligations. The Court does not find the requisite termination of the Recap Agreement here.

### B.

■ Thus, because the Court assumes that at all relevant times after October 1, the Recap Agreement has been and remains an executory contract,[28] the Court

turns to the balancing that informs the exercise of the Court's discretion on motions of this character, with the assistance of the factors identified in the cases described above. In that context, ML Media argues that it has already suffered significant prejudice by reason of the Debtors' failure to buy ML Media out, and also by reason of the Debtors' failure to provide ML Media with the ability to manage the Systems and the failure to provide ML Media with information and management rights important to ML Media in protecting its investment. ML Media further argues that it will continue to suffer if Adelphia and Century are permitted to further delay providing ML Media with the benefits and protections for which ML Media bargained when it settled the Initial Action, and that any further delay threatens ML Media with additional loss and risk to the value of the Systems.

Adelphia and Century assert that they are performing their post-petition obligations (most significantly, as manager of the Systems), and that ML Media will not be prejudiced by providing Debtors time to assume or reject the Recap Agreement, other than by delay in getting payment to which ML Media may be entitled-a hardship suffered by chapter 11 creditors generally. They further argue that they need to make a reasoned judgment on a matter with this much at stake, and have not yet been a position to do so.

The Court subscribes in part to the points made by each side, but also has its own perspective, which is difficult to pigeonhole into acceptance or rejection of

---

28. ML Media has not contended that the Recap Agreement is not an executory contract for any other reason. Since, upon performance by Adelphia and/or Century, ML Media would have a corresponding duty to convey, it is more likely than not that the Recap Agreement *is* an executory contract, but the Court merely assumes it to be an executory con-

tract, and does not decide this issue. The Court likewise does not decide whether or not the Recap Agreement is unenforceable, as a fraudulent conveyance or otherwise, though it does note that there are contentions on the part of the Debtors in this regard, which, as noted below, are a factor to take into account on motions of this character.

either side's contentions. It also finds most, but not all,[29] of the judicially identified factors to warrant consideration here (though they not infrequently overlap), and finds other matters, not expressly listed, or listed in so many words, to be relevant as well. For that reason, the Court simply lays out the factors that inform the exercise of its discretion in this regard.

### 1. "Interests at Stake"

When the Court considers the "interests at stake," it finds those interests important to both parties. The Court respects ML Media's point that "[u]nlike the Debtors, the Cable Venture is ML Media's only active business, and ML Media has been trying for years to receive the benefit of its contractual bargain by compelling a sale of its interest."[30] However, the Systems are a not-unimportant part of the Debtors' business too, and an exposure in the amount of $275 million—as either a prepetition claim or, especially, an administrative expense (as it would be if the Debtors were to assume)—is of considerable importance to the Debtors as well, even in a chapter 11 case of this size.

Both sides have legitimate needs and concerns in this regard, and this factor does not materially tip in either side's favor.

### 2. Balance of Hurt to the Litigants

The "balance of hurt to the litigants" tips in the Debtors' favor, in the short run, but tips in ML Media's favor as the amount of the requested time increases. For reasons discussed below (in connection with providing the Debtors with a fair time to decide, with which this factor overlaps), the Court believes that it plainly would be

very damaging to the Debtors to require a decision "forthwith" on a matter of this importance, or even in a matter of weeks. However, the Court has some difficulty seeing how, if the Recap Agreement is as bad for the Debtors as they suggest it is (by trying to invalidate the Recap Agreement as a fraudulent conveyance), they could *ever* decide to assume it—and if that is so, what we are really talking about is a highly likely decision to reject, and delaying the decision merely keeps ML Media in limbo, without providing for a means for the parties, and ultimately the Court, to confront the consequences of rejection. When we get past the short term, the Court considers that unfair and inappropriate.

The Court finds that there is a relatively modest harm to ML Media in the short term, with substantial harm to the Debtors if they are required to assume or reject "forthwith" or in the short term, but that the tipping in the Debtors' favor decreases with time, and, with increased time, ultimately tips the other way.

### 3. "Good to Be Achieved"

The matter of "the good to be achieved" is largely a variant of the preceding factor. While the Court does not make business decisions for the parties (or purport to be sensitive to all of the considerations that they would take into account), the application of this factor necessarily requires the Court to give at least some consideration to the alternatives (and consequences of those alternatives) that are on the table, so as to evaluate the good that an earlier, or later, decision to assume or reject would achieve. While assumption is of course

**29.** As the Court is making a reasoned decision here—considering, as best it can, the factors identified in the caselaw and other relevant ones—it does not believe that the action it will

take "is so in derogation of Congress' scheme that the court may be said to be arbitrary."

**30.** ML Media's Brief at 5.

theoretically an option, the more likely ultimate determination that the Debtors will make (assuming, as the Court does, that the fraudulent conveyance assertions were made with the belief that the Recap Agreement was a very bad deal for the Debtors) is rejection, and thus the decision as to simply whether to assume or reject may not be all that difficult. The Court recognizes that a related issue that the Debtors will have to confront is whether they want to buy out ML Media (and thereby keep the Systems) or sell them to a third-party—a very important (and possibly difficult) decision—but that is one that could be made with or without the Recap Agreement in place.[31] Another decision the Debtors doubtless would prefer to be free to make is whether they want to continue with the enhanced management rights they now have under the Recap Agreement, or whether they will be content with the lesser (but still significant) management rights they had under the Joint Venture Agreement before the Recap Agreement was executed. But while the Court believes that a debtor's desire for flexibility in this regard is understandable, it is insufficient, in the Court's view, to keep ML Media in limbo indefinitely, and this factor, accordingly, materially benefits the Debtors only in the short run.

The "good to be achieved" from ML Media's perspective is minimal in the short term, and more substantial in the long term. Many executory contract counterparties in chapter 11 cases would like to get their contracts assumed (and, with that, their prepetition debt paid early and in full), but the hope of that—especially where, as here, that possibility is slim—is insufficient, in the Court's view to fairly

consider that to be a "good to be achieved." ML Media's desire to be bought out, and to be paid sums to which the Recap Agreement entitles it, is understandable, but is a concern shared by thousands of creditors of the Debtors' estates who likewise are waiting to be paid. The more fundamental "good to be achieved" is relieving ML Media from sitting in limbo for an inordinate amount of time, and providing it with greater management rights to which it ultimately may be entitled.

### 4. Safeguards Afforded to the Litigants

"Safeguards afforded to the litigants" are more important on this motion than on many. ML Media has been suffering in two principal ways by reason of the Debtors' inaction; ML Media has not received the buyout to which it is at least arguably entitled, and it has been at least arguably deprived of management information and, at least in part, management control. The former has already been discussed; the latter can be ameliorated in the short term by measures, akin to those already directed by the Court, requiring the Debtors to share information with ML Media and to keep it properly informed, although the Court would not regard that as a long term solution.

An ultimate rejection decision may have the result of returning the parties to the status quo ante before execution of the Settlement Agreement and the Recap Agreement, which would give ML Media more meaningful management rights than it has now. The Court regards the present safeguards as satisfactory in the short term, but for many (though not all) of the reasons ML Media argued,[32] the Court

31. If the Recap Agreement were to be rejected, and ML Media sought (as is to be expected) damages for resulting loss, fraudulent

conveyance issues could be considered as part of the claims allowance process.

32. *See* ML Media Br. at 6. Some are rights that ML Media will have, sooner or later,

does not regard them as a satisfactory substitute, in the long term, for the management rights ML Media might have, or arguably have, after rejection.

### 5. Compliance with Postpetition Obligations

The Debtors contend that they have met their postpetition obligations, saying that they "have continued to perform satisfactorily as manager of the Systems ..." despite their belief that the Recap Agreement "may be unenforceable."[33] ML Media's concerns with respect to the Debtors' performance—particularly with respect to information flow—have been previously discussed.

The Debtors' performance has not been so bad that postpetition performance deficiencies would trump other factors, but it has not been notably good, either. Additionally, as the Debtors properly note,[34] *Burger Boys* teaches us that while postpetition performance is a *relevant* factor, it cannot properly be regarded as the *only* consideration. For all of these reasons, under the facts of this case, the Court does not regard this as a significant factor.

### 6. Damage Beyond Compensation Available Under the Code

ML Media asserts, with some force, that the loss of its management rights is difficult to provide compensation for under the Code, and with less force that this is likewise true with respect to the failure to make the buyout payment. To the extent this factor is applicable (and the Court believes it to be applicable with respect to management rights, but not payment), this factor overlaps with the two other factors

of the balance of hardships and safeguards to reduce prejudice. The Court agrees that it would be difficult fully to compensate under the Code for the loss of the management rights, though it would not be impossible, and this must be viewed in the perspective that the management rights are a means to facilitate ML Media's recovery of the buyout payments to which it claims entitlement—for which compensation under the Code is, indeed, possible. On balance, this factor tends, though mildly, to favor setting some time to assume or reject, to protect ML Media from delays of indefinite duration.

### 7. Importance of Contract to Debtor's Business and Reorganization

The factor of the executory contract's importance to the Debtors' business and reorganization is one as to which both sides can make legitimate points. ML Media can appropriately note that the Systems are hardly the sole assets of the Debtors, and are not as individually important, relative to the Debtors' business or reorganization as a whole, as were the executory contracts in *Burger Boys* or *Theatre Holding*. While the Debtors can properly observe that the Systems are hardly trivial in importance, the Court believes that making a decision within a finite time frame, particularly one that is of reasonable length, would not impair the Debtors' ability to reorganize, or even subject the Debtors to any significant business risks—other than the loss of the advantage (plainly desirable from the Debtors' perspective, but in essence in the nature of a windfall) of keeping ML waiting indefinitely, without the need to face the consequences of a rejection. This factor, while

---

unless the Debtors assume, but the Court agrees that a good number of them "may be of little effect if the Debtors are allowed to keep the temporary provisions of the Recap Agreement in effect indefinitely." *Id.*

**33.** Debtors Br. at 12–13.

**34.** Debtors Br. at 13.

a wash in the short run, favors ML Media in the long run.

### 8. Sufficient Time to Appraise Financial Situation

The factor of time to appraise one's financial situation—or, its first cousin, fair time to consider alternatives—has been a major matter of concern for this Court from the outset. It strongly favors the Debtors in the short run, though it becomes of lesser importance, and ultimately minimal importance, with the passage of time. When ML Media first made its motion, the Debtors were operating under interim leadership, while actively engaged in the search for a CEO. That effort took many months. The matter of the Debtors' new leadership involved controversy, which was resolved only after a week-long trial, and the Court's decision on March 4 ultimately approving the employment of Messrs. Schleyer and Cooper. The Court's discretion with respect to this motion has been substantially informed by its view that the decisions required to be made with respect to the Debtors' relations with ML Media were too important for interim management to make, and should be made only in the context of the Debtors' strategic planning, which would have to await the arrival of the new senior management.[35] Until that senior management was employed, it would have been manifestly unjust, in the Court's view, to conclude that the Debtors' had sufficient time to make the necessary decisions—especially if, as it would appear (though the Court is not prejudging the matter) if the Recap Agreement is rejected, the parties will still have their rights under the Joint Venture Agreement, and the Initial Litigation will resume.

Now that Messrs. Schleyer and Cooper have been brought on board, a major impediment to the Debtors' ability to make the decisions they need to make has been eliminated, but the Debtors still need a reasonable time to allow Messrs. Schleyer and Cooper to make the necessary decisions. For that reason, an order requiring assumption or rejection "forthwith" is, in the Court's view, as unrealistic now as it would have been on October 1. However, the Court agrees that the time for them to decide should not be limitless, and this factor—which in the short run is the most important—becomes one of decreasing importance with the passage of time.[36] With Messrs. Schleyer and Cooper having now been brought on board, the clock now can, and in the Court's view should, begin to run.

### 9. Need for Determination as to Whether Executory Contract Exists

The need for determination as to whether an executory contract even exists is sometimes an important factor in determining whether, and/or to what extent, an extension of the time to decide should be granted—particularly where (as here, though it was done belatedly) litigation has been commenced by a debtor to determine that issue. The need for first deciding the issue is of particular importance when the

---

**35.** This concern accounted, in substantial part, for the time of issuance of this decision; the Court was of the view that it would be difficult, if not impossible, to issue a just decision with respect to this motion before new senior management was put into place.

**36.** ML Media also argues, in one of its less persuasive points, that this factor, along with the purposes of chapter 11, is of "little weight" because, ML Media contends, "the Recap Agreement is scheduled to terminate by, at the latest, October 1." ML Media Br. at 6. The Court has of course rejected the premise upon which this contention rests. *See* page 19 above.

debtor needs property or contractual rights that the debtor receives under the allegedly executory contract, and (assuming that the contract is held to be executory), the Debtor can preserve its interest in such property or rights only by assumption. But it is of lesser importance where the principal effect of the litigation will be not with respect to the ownership (vel non) of the rights in question, but merely the amount of the Debtors' financial exposure.

Here it would appear that Century will continue as an owner of the Cable Venture, and Adelphia will continue as manager, even if the Recap Agreement is rejected, though plainly each will have to then confront consequences of such a decision, such as claims for rejection damages, increased management rights for ML Media, and/or the re-emergence of ML Media rights (and litigation) that were given up when the Settlement Agreement and Recap Agreement were entered into. If the Debtors prevail in their fraudulent conveyance claims, they may be able to eliminate rejection damages, but it is not clear to the Court that a judicial determination of the controversy is all that necessary for the Debtors to conclude whether the Recap Agreement is in their interests or not. The Court is disinclined to allow the Debtors to indefinitely keep ML Media on hold based on uncertainty as to whether or not the Recap Agreement is a fraudulent conveyance when the only real significance of that determination may be the consequences of a decision not to perform under the Recap Agreement that the Debtors may regard themselves as compelled to make anyway.

### 10. Exclusivity

While the Debtors of course now continue to have exclusivity, the Court considers this factor to have minimal significance here. The Recap Agreement is not so critical to the Debtors' operations that their ability to reorganize (or their exclusive right to file a reorganization plan) will be affected in any significant way by their decision to assume or reject it.

### 11. Purpose of Chapter 11

Plainly one of the purposes of chapter 11 is to give debtors a time to "stop, look and listen" with respect to the future of their business affairs, as well as future reorganization efforts. But this factor, like several of the others, has diminishing significance as the requested time to decide increases. In the short term, this factor too compels a determination that the Debtors not be required to make a decision "forthwith." However, in the longer term, it is a lesser factor.

### 12. Overall Decision

As in most cases involving consideration of various factors, the Court does not weigh the above factors equally. Most applicable, in the Court's view, are those relating to the inability of the Debtors to make a decision up to this point in time, or for several months in the future (and the fact that the significance of this factor will decrease with time), and the fact that over the longer term, fairness requires that ML Media not be kept in limbo—especially when, if the Debtors' fraudulent conveyance contentions with respect to the Recap Agreement are taken to their logical conclusion, a rejection is highly likely in any event. Balancing these factors, the Court concludes, in the exercise of its discretion, that the Debtors deserve another three months to assume or reject, but they do not need, nor, in fairness to ML Media, should they receive, a longer time.

## II.

As the second prong of its motion, ML seeks an order directing that if the

Recap Agreement is not assumed by October 1, 2002 (a date that by now has passed), ML Media become manager of the Systems. The Court believes that this request must be denied. While the Court is sensitive to ML Media's concerns, and has ruled that ML Media will not be in its present straits indefinitely, the Court regards this prong of ML Media's motion as a backdoor method to achieve a kind of specific performance, and/or relief by mandatory injunction, of a type that is unwarranted on motions of this character, if, indeed, it is warranted under any circumstances at all.

In support of its contention, ML Media contends that it is seeking an equitable remedy, and based on the definition of "claim" under the Code,[37] contends that it will not have a "claim" by reason of the denial of its management rights and its desire for equitable relief to obtain them. ML Media premises its argument on section 101(5)(b), which includes, as a "claim," the right to an equitable remedy for breach of performance "if such breach gives rise to a right of payment," and ML Media contends that because it "cannot be satisfied by money damages," it is entitled to specific performance.[38]

ML Media plainly seeks money, and the additional management rights are one of a number of remedies to secure, or maximize the chances of getting, its entitlement in that regard. The Debtors were not unfair in noting that the management rights ML Media seeks "are nothing more than a remedy to protect what ML Media contends is its secured claim for $275 million."[39] ML Media did not cite authority for its contention that this additional remedy could or should be separated for the purpose of giving it specific performance, especially in this procedural setting, and the Court has concerns as to whether a section 365 motion is the appropriate vehicle for dealing with a matter that so dramatically affects substantive rights. *Cf. Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.),* 4 F.3d 1095, 1102 (2d Cir.1993) (permitting a bankruptcy court to rule conclusively on a decisive issue of breach of contract would be "incompatible with the limited purpose of motions to assume of ensuring that valuable property is preserved and burdensome property discarded").

Additionally, what we have here is in essence a renewed effort to secure the change of management rights that ML Media sought by injunction application at the outset of Century's chapter 11 case. The same concerns as to irreparable injury and the balancing of hardships that informed the Court's determination at that time remain.

For all of these reasons, then, this prong of ML Media's motion must be denied.

### Conclusion

Accordingly, ML Media's motion is granted to the extent of determining that the Debtors have 90 days from the date of this decision and order to assume or reject

---

**37.** *See* Bankruptcy Code section 101(5):
"[C]laim" means—
(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or
(B) right to an equitable remedy for breach of performance *if such breach gives rise to a right to payment,* whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured. . . .
(Emphasis added).

**38.** ML Media Br. at 11–12.

**39.** Debtors' Br. at 22.

302

the Recap Agreement. It is otherwise denied.

SO ORDERED.